Carminati *v.* Philadelphia Transportation Company, Appellant.

Argued November 14, 1961. Before BELL, C. J., MUSMANNO, JONES, COHEN, BOK, EAGEN and ALPERN, JJ.

*Philip Price,* with him *John P. Mason, Bernard J. Smolens,* and *Barnes, Dechert, Price, Myers & Rhoads,* for appellant.

*James E. Beasley,* with him *Beasley & Ornsteen,* for appellees.

OPINION BY MR. JUSTICE MUSMANNO, January 2, 1962:

On September 27, 1954, Jean Carminati, 10 years of age, living in Glenside, Montgomery County, started home from school, carrying in her hand a box of toys. She proceeded south on Easton Road and as she approached Keswick Avenue which intersects Easton, running east and west, she observed a street car stationary on Keswick, west of Easton Road. A green light at the northeastern corner of the intersection invited her to cross Keswick, but when she had passed beyond half of the width of that street, the street car unwarningly started forward and struck her, inflicting serious injuries.

Her parents in their own right and in her behalf brought suit against the Philadelphia Transportation

Company, and at the ensuing trial the jury returned verdicts in the sum of $11,199.45 for the parents and $79,500 for the child. The defendant moved for judgment n.o.v. and a new trial. The Court reduced the verdict of the parents to $4699.45 (which reduction was accepted by the parents) and refused both motions. The defendant appealed. It no longer seeks judgment n.o.v. and is content to have a new trial on the asserted basis that the verdict was against the weight of the evidence and that the amounts of the verdicts were excessive.

The record does not justify a long discussion on the question as to whether the verdict offended against the weight of the evidence. Jean Carminati's testimony was clear and unequivocal that she was moving across Keswick Avenue under the protection of a green light when the street car ran her down. A witness to the accident, Kathryn Leary, testified that when Jean Carminati arrived at Keswick the light was green for traffic moving on Easton Avenue and red for traffic (including the street car) moving on Keswick. There were some variations in this statement but it was for the jury to affirm, reconcile or reject the witness's testimony.

The defendant argues that the mishap on Keswick Street was the result of the child running into the street car, instead of the street car running into the child. To support this argumentation it points to the circumstance that the child's box of toys was found on the north or left side of the track. This line of reasoning presupposes that the box fell with the child, but it is entirely consistent with the possibilities that when the child and the street car came together, the violence of the impact sent the box flying out of the girl's hands to the left of the car.

Then the defendant company emphasizes that the motorman testified he did not see anyone on the track

ahead of him prior to the collision. But it is apparent that the jury did not believe the motorman when he said this, nor can we say a wholly impartial evaluation of the testimony did not accompany the jury's deliberations and conclusions here. In fact, the jury could decide, and apparently did so decide, that it was precisely the motorman's inattention to his duties which blotted out Jean Carminati's presence on the tracks.

It is significant to note that although the defendant contends Jean Carminati collided with the car, it did not at any time charge her with contributory negligence which factor would certainly have been a subject for the jury's consideration had Jean actually taken herself voluntarily into the danger announced by the defendant. It is also significant to observe that the motorman was aware, and so admitted, that school children were in the area of the locale of the accident so that again we have a question for the jury to determine whether the motorman operated his car in accordance with the degree of care required when children of a tender age are close to railway tracks.

We are satisfied from the record that the lower Court was warranted in refusing a new trial because of an asserted confict between the verdict and the weight of the evidence.

We now take up the matter as to whether the verdict of $79,500 for Jean Carminati was excessive for the injuries sustained by her. When the trolley car knocked her to the street the blow stunned her into unconsciousness. As she revived she became hysterical and went into convulsions. Her nose bled, she vomited blood. She was transported to a hospital where she remained four days. Her right eye swelled and was closed for approximately two weeks. For the next seven weeks Jean returned to the hospital once a week for treatment.

A serious complication now set in. The child found herself unable to focus her eyes properly; double vision followed. She suffered, in the words of the trial court, "a pronounced limitation of the upward gaze of her eye, a drooping of the right upper eyelid and an inability to elevate the right eye."

An attempt was made to correct this condition by an operation, which resulted, as described by the court below, "in an upturn of the right eye but her left eye now turned downward. On October 31, 1959, the physicians noticed that she had developed a marked head tilt to the right which was also observed at the trial.

"The minor plaintiff's downward area of vision has been curtailed by the head tilt which is necessary if she is to avoid seeing double when she attempts to look down. Because of this she often stumbles over near-by objects and cannot use her eyes for reading when she sits up straight." As a result of all this, the child has developed a nervous condition.

Dr. Thomas R. Hedges, an eminently qualified opthalmologist, testified that in his opinion Jean's ocular disablement was caused by the accident of September 27, 1955, and that it is a permanent disablement.

Although the defendant company engaged two physicians to examine Jean, neither of these doctors was called to testify, nor did the defendant offer any testimony to contradict the medical evidence presented by the plaintiff. The defendant thus allows the not unreasonable assumption to form that it does not doubt the gravity of Jean Carminati's condition, as described by her doctors.

Jean Carminati's condition has thrust her into an economic state which approximates permanent unemployment. A girl with double vision who must hold her head at a bizarre tilt will have serious difficulty in getting through the barriers which surround most

good jobs. She wears glasses but they do not correct the double vision: "Q. Have you worn glasses after the accident that tried to correct this condition? A. Yes. Q. Have they helped you in any way? A. No, none whatsover. Q. So even with the glasses, you see double? A. Yes. Q. Has it affected you in any way besides seeing double? A. Well, it makes me nervous because I can't stand up straight so I can seem taller. Q. What about anything else? Has it affected you in any other way? A. Well, I stumble over things under my feet. Q. Why is that? A. Because I cannot see them."

Because of the injury to her eyes and her resultant awkward stance, she is tormented by her fellow schoolmates: "Q. What have they said? A. That I looked cock-eyed. Q. Anything else? A. I look funny. Q. How did that make you feel? A. Terrible."

The defendant company complains because no evidence was introduced to show impairment of earning power. Of course, it would be difficult, if not impossible, to demonstrate mathematically what Jean Carminati will lose financially as a result of her disablement since obviously she had not been remuneratively employed prior to her accident. (*Rosche v. McCoy,* 397 Pa. 615.) However, it does not require much reflection or study to conclude that the doors of offices, banks, stores, and factories will probably be closed to Jean for any work which requires the precisional use of her eyes. And it is to be emphasized that her disablement is permanent. A permanent injury is not one which eventually causes a person's death; it is a disablement which *accompanies* him or her to the grave.

Aside from the amount of money Jean will lose because of economic incapacitation, Jean is entitled to compensation for the pain and suffering inflicted upon her and what may still be her due because of the injuries done to the muscles involved in the entire ocular complex. The manner in which Jean must hold her

head produces a posture which could be interpreted as that of a person not entirely normal, physically and mentally. The embarrassment and humiliation attendant upon this irremediable circumstance is an item for consideration in determining what she is entitled to in the verdict.

In explaining why it did not regard the verdict for Jean excessive, the court below said, after speaking of the economic loss: "There is also to be considered the pain and suffering this child has undergone as a result of her injuries. In addition, the humiliation and embarrassment which she had endured and is likely to endure in the future is an item for which she is entitled to compensation. Burgan v. Pittsburgh, supra.

"The cosmetic appearance of this girl must be considered. Certainly, it is not open to question that her appearance is not that of a healthy, normal fifteen year old girl. The jury was told, and it is not disputed, that her condition will be permanent. It cannot be doubted that the minor plaintiff's chances for marriage and support by a husband have been greatly diminished, and this, too, is a factor which must be taken into consideration."

Jean Carminati, like every girl in the world, would want to be attractive. Untold hundreds of millions of dollars are spent annually in the United States by and for girls so that they may enter the temple of physical attractiveness and there assuredly await the men whom fate decrees shall be their husbands. The doors of this temple are perhaps sealed to Jean Carminati. She may have to wait at another tarrying point—the house of sympathy—for the man who will close his eyes and accept his life mate principally on commiseration and faith.

The right to a husband is a treasure in itself: an assured roof over one's head, food on the table and clothes on one's back. Respect for one's person and

status in the neighborhood; and motherhood, the most priceless boon of all, are among the many things which in America go with matrimony. To the extent that Jean Carminati has been denied the likelihood of marriage because of her condition and appearance as the result of the accident of September 27, 1954, she has suffered an item which enters into the calculation of a compensable verdict.

In the abstract, the amount of $79,500 seems like a large sum, but, considering Jean's life expectancy of 59 years, the figure of $79,500 undergoes considerable shrinkage spread out over that many years because, when she receives the money, it will be the sum total she will have for the remainder of her existence. $79,-500 is the lifeboat which will carry her over the sea of the expected years ahead. In view of the fact that her parents will be required to support her until she reaches the age of 21, she will thus be on her own for 53 years. $79,500 divided by 53 produces $1,386 per year, hardly an excessive amount of monetary ammunition with which to fight the sharks of high costs of living.

In *Rice v. Phila. Trans. Co.*, 394 Pa. 454, where we considered the question of an alleged excessive verdict, we said: " 'Where permanent injury is involved, the whole span of life must be considered. Has the economic horizon of the disabled person been shortened because of the injuries sustained as the result of the tortfeasor's negligence? That is the test.' "

In terms of substantial returns in life one can hope as far as one can see. In a literal sense the plaintiff in this case cannot see very far. Her doctors said in effect that her economic horizon is zero. The defendant did not, with the equipment of appropriate countervailing testimony, lift that horizon.

It attempted instead, to prove excessiveness by making a comparison between the medical expense incurred

and the amount of the verdict. This type of comparison may be as unreliable as an elastic ruler. The medical expense in this case was only $199.34, but how can an expenditure, no matter how small or large, be used as a measuring rod for ascertaining the value of eyesight, the most priceless jewel of life? A person might be wholly blinded in a manner which would involve only a slight medical expense, but what mathematician could calculate what it is that has been lost in the abyss of irrecoverable hope by the disappearance of the paradise of sight? A man's arm could be severed away as neatly and completely by a locomotive wheel as if the amputation had taken place on an operating table so that the expense of convalescence would be comparatively negligible, but that amount could never be the basis for calculating the horrendous loss the victim has suffered as he faces the battle of life with but one arm to fend for himself.

In the case of *Lopez v. Price,* 145 A. 2d 127, 132 (Conn., 1958), the minor plaintiff, 4 years of age, was awarded $75,000 for the loss of an eye. What was said in that case is relevant to this case although it must be acknowledged that comparison of verdicts is not always a reliable criterion in determining the just amount of a verdict, since circumstances between cases vary. However, the reason employed in the Connecticut case is germane to the case at bar: "Pamela's life expectancy, at the time of trial, was 65.64 years. If the award of $75,000 were to be considered as compensation for her eye injury alone, that amount divided by the number of years of her life expectancy would provide only approximately $1150 per year. It is true that because her life expectancy was 65.64 years it cannot be said that she will live that number of years after the date of the trial. She may die sooner or she may live longer. The number of years she may be expected to live was, however, a factor which the jury could prop-

erly consider . . . 'The question of damages in personal injury cases, especially in these times of changing values, is always a difficult one. Prosser v. Richman, 133 Conn. 253, 256, 50 A. 2d 85. Assessment of damages is peculiarly within the province of the jury and their determination should be set aside only when the verdict is plainly excessive and exorbitant . . . The only practical test to apply to a verdict is whether the award of damages falls somewhere within the necessarily uncertain limits of fair and reasonable compensation in the particular case, or whether the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption.' "

We cannot say as an appellate court that the verdict of $79,500 shocks our sense of justice and certainly there is nothing to suggest that the jury here was influenced in any way by "partiality, prejudice, mistake, or corruption."

We also see no reason for disturbing the already reduced verdict awarded the plaintiff parents.

Judgment affirmed.

Mr. Justice BENJAMIN R. JONES dissents on the question of damages.