Alvin H. FRANKEL, Guardian of the Estate of Marilyn Heym, an incompetent, and Herbert Heym and Mary Heym, his wife, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Alvin H. FRANKEL, Guardian of the Estate of Marilyn Heym, an incompetent, Plaintiff,

v.

Mary HEYM, Defendant, Third Party Plaintiff,

v.

UNITED STATES of America, Third Party Defendant.

Civ. Nos. 40367, 68–876.

United States District Court,
E. D. Pennsylvania.

Dec. 30, 1970.

Marvin I. Lessin, Manchel, Lundy & Lessin, Philadelphia, Pa., for Alvin H. Frankel, Guardian of the Estate of Marilyn Heym, an incompetent, plaintiff in Civ. A. No. 40367 and Civ. A. No. 68–876.

Howard Richard, Richard, Brian & DiSanti, Upper Darby, Pa., for Mary Heym and Herbert Heym, plaintiffs in Civ. A. No. 40367.

A. Grant Sprecher, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for Mary Heym, defendant in Civ. A. No. 68–876 and defendant on counterclaim in Civ. A. No. 40367.

William D. Ruckelshaus, Asst. Atty. Gen., William E. Nelson, Charles T. Wells, Civil Division, U. S. Dept. of Justice, Washington, D. C., Louis C. Bechtle, U. S. Atty., Philadelphia, Pa., for the United States.

SHERIDAN, Chief Judge (M. D. Pa., sitting by special designation).

On April 30, 1966, a car driven by Mary Heym in which her daughter, Marilyn Heym, was a passenger collided with a car driven by Ronald Glasser, an employee of the Department of the Army. The accident occurred at the intersection of West Chester Pike with Providence Road, in Edgemont Township, Delaware County, Pennsylvania. Both Mrs. Heym and her daughter suffered serious injuries.

Two negligence actions were started to recover damages for the injuries. Civil Action No. 40367, filed May 26, 1966, is an action against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq. by Alvin H. Frankel, Guardian of Marilyn Heym, an incompetent, and by Herbert Heym and Mary Heym to recover for the injuries to Mary Heym and to Marilyn Heym.[1] The United States filed an answer in which it denied liability and set up contributory negligence as a defense. It filed a counterclaim against Mary Heym for damages to its car. Civil Action No. 68–876, filed April 25, 1968, is a diversity action by Alvin H. Frankel, Guardian of Marilyn Heym, an incompetent, against Mary Heym to recover for the injuries to Marilyn Heym. Mary Heym brought in the United States as a third party defendant.

The actions were consolidated for trial and tried to the court without a jury. The substantive law of Pennsylvania controls in both actions.

Glasser, acting within the scope of his employment, was proceeding in a westerly direction at a speed of 55 miles an hour on West Chester Pike, a four lane highway with a speed limit of 50 miles an hour. The highway was wet and his vehicle had bald rear tires and nearly bald front tires. He saw the Heym vehicle as it approached West Chester Pike from his left and as it crossed the eastbound lanes to the medial strip and then into the westbound lanes. As Mrs. Heym crossed the medial lane, he was some 250 feet from the intersection. In-

---

1. The original plaintiffs were Herbert Heym and Mary Heym, his wife, and Marilyn Heym, a minor by her parent and natural guardian, Herbert Heym. On April 25, 1968, the Orphans Court of Delaware County declared Marilyn Heym an incompetent, and appointed Alvin H. Frankel her guardian. The complaint was amended to substitute him for the natural guardian Herbert Heym.

stead of slowing, he continued at the same rate of speed on the unwarranted assumption that Mrs. Heym was going to turn left into West Chester Pike, and 80 feet from the intersection he merely changed from the inside lane in which he was traveling to the outside lane with the intention of passing Mrs. Heym on the right. When Mrs. Heym was about to enter the outside lane, he attempted to reduce his speed. He applied his brakes when he was 50 to 60 feet from the intersection, but because of his speed, the wet conditions, the smooth tires, and the late braking, he could not avoid the collision. His assumption that Mrs. Heym was going to make a left turn onto West Chester Pike was unwarranted because there was no movement or signal which indicated a left turn. Even if a left turn had been indicated, a reasonable and prudent person would not merely have changed lanes, but also would have decelerated in case the assumption was incorrect.

Mrs. Heym testified that when she reached the medial lane and was then traveling at 3 miles an hour, Glasser was between 645 and 1075 feet from the intersection, and that she concluded she had ample time to cross the westbound lanes. The westbound lanes were each 12 feet wide, and the medial strip was 16 feet wide. The accident happened in the outside westbound lane as she was about to enter, or had just entered, Providence Road. Thus, she traveled 30 feet from the medial strip to the point of impact. Since she accelerated from 3 to 10 miles an hour, she would have traveled that distance in approximately 3 seconds, if a mean of 7 miles an hour is used. For Glasser to have covered between 645 and 1075 feet in the same time, he would have had to be traveling

at speeds in excess of 140 miles an hour.[2] Mrs. Heym was operating a small Corvair station wagon. After it was hit broadside by the larger Dodge sedan, the vehicles came to rest only 25 feet from the point of impact. Pictures show that the left front fender, headlight and perhaps the left front part of the grill of the Dodge were damaged. The hood was not sprung and the remainder of the front seemed intact. No windows were broken, Glasser was injured slightly. He had abrasions of the elbow and some neck pain. There is no indication that Glasser's passenger, Patterson, was injured. The damage to the Corvair was confined for the most part to the right front and rear door area. The Dodge struck the Corvair in the center bar separating the front and rear doors. The windows were not broken, there was no damage to the right front fender, and little damage to the right rear panel. Mrs. Heym and Marilyn were thrown from the Corvair[3] and this, rather than the impact, undoubtedly caused the extensive injuries.

Glasser testified it was possible that he had been traveling at 55 miles an hour in the half mile before impact. Although he applied his brakes 50 to 60 feet before impact, the car slowed "very little," and he admitted that it was out of control during that 50 to 60 feet. He admitted that from a point when he was a half mile from the intersection until he was 50 to 60 feet from it, he did not apply his brakes because he mistakenly assumed that Mrs. Heym was going to turn left to proceed westerly on West Chester Pike. He changed from the inside lane to the outside lane thinking he could pass her on the right.[4]

2. A vehicle going 60 miles an hour travels 88 feet a second. The rule of thumb is that distance traveled per second equals one and one-half times the speed. For speeds greater than 60 miles an hour the actual distances are greater. Using the rule, Glasser would have been traveling at speeds between 140 and 230 miles an hour.

3. Marilyn was pinned beneath the Corvair, with its frame resting on her.

4. "BY MR. RICHARD:
 Q And, as a matter of fact, Mr. Glasser, isn't it correct that the reason that you were making your switch to the right lane is that you saw this vehicle coming angularly across the highway—

■ Glasser had a clear view of the intersection for more than 1000 feet. He saw Mrs. Heym as she approached the intersection on Providence Road and saw her cross the eastbound lanes. He was about 250 feet from the intersection when Mrs. Heym was in the medial lane and starting to move across the highway. He changed to the outside lane and was proceeding at an angle when the collision occurred in the outside westbound lane. If he had been driving carefully, he would have reduced his speed or stopped and avoided the collision. He was negligent and his negligence was a substantial factor in causing the accident and the injuries to Marilyn.

■ Glasser cannot claim the benefit of the "sudden emergency" rule. One driving carelessly cannot say he was placed in sudden peril. Chadwick v. Popadick, 1960, 399 Pa. 88, 159 A.2d 907. The emergency arose, at least in part, because of his negligence in proceeding too fast under the conditions, in his failure to heed the movements of Mrs. Heym, and in his failure to decelerate at a proper time.

Mrs. Heym knew that vehicles on West Chester Pike had the right of way, and that the speed limit was 50 miles an hour. She had an opportunity to observe the position and movement of Glasser since she had an unobstructed view to her right of more than half a mile. She crossed the eastbound lanes at 6 to 7 miles an hour, and did not stop at the medial strip, but merely slowed to 3 miles an hour and then proceeded across the westbound lanes, accelerating to 8 to 10 miles an hour as Glasser closed in. He was only 250 feet from the intersection when she started from the medial strip. She should not have attempted to cross the westbound lanes under the circumstances. Glasser had the right of way. Mrs. Heym was not justified in thinking she could enter and cross the intersection without danger of collision. She was negligent and her negligence was a substantial factor in causing the accident and the injuries to Marilyn.

The negligence of Glasser and the negligence of Mrs. Heym were concurrent and the negligence of each was a proximate cause of the accident and the injuries to Marilyn.

Marilyn was severely injured. She was taken by ambulance to the Emergency Room of the Haverford Hospital. She was unconscious, in severe shock and appeared to be near death. She had a compound fracture of the skull, severe brain damage, severe crush injuries to the left hand and wrist, a comminuted fracture-dislocation of the carpal and metacarpal bones of the left hand, a fracture of the left clavicle, contusions of

that is, Providence Road comes in at an angle, the car was going straight—and you merely misjudged the action of the car, thinking it was going to go left and you felt that you would go around it by accelerating and coming back to the left so that you would be in a position just over the hill to make your left-hand turn?

Isn't that an accurate description of what actually occurred on this day?

A Well, it was part of it."

In explaining this statement, he indicated that he was not justified in his assumption.

"BY MR. WELLS:

Q Will you explain to Judge Sheridan what you meant by 'Partly correct.'

MR. RICHARD: I don't think he said 'Partly correct.' That is the point where I objected before.

MR. WELLS: Yes.

THE COURT: Well, the record will show what he said. He used the word 'Part,' I know.

MR. RICHARD: That explains part of it.

THE WITNESS: 'Partly right,' I think I said.

THE COURT: Whatever you said, explain it.

THE WITNESS: What I meant by the question that Mr. Richard directed to me, I meant that by partly right that I was not sure of what she was going to do, whether she was going to make a left or go straight, but I did not accelerate; I tried to decelerate at this point."

her kidneys, and symptoms of gross convulsive seizures. Her whole body was spastic; her arms and legs were extended; her hands were in a state of deformity; her eyes were rolled back; she had severe bleeding lacerations; she was also bleeding vaginally and through her ears. Six specialists performed emergency surgery. She remained in Haverford Hospital until July 18, 1966, during which time she was in a coma. It was necessary to amputate her left arm. She had frequent convulsions and seizures and occasional elevations in temperature which required that she be packed in ice. During most of the time she was rigid and spastic. On July 18, she was transferred to the University of Pennsylvania Rehabilitation Center in a state of coma vigilante. On July 28, she was transferred to All Saints' Hospital because the Center could not cope with her noisy outbursts. The discharge diagnosis was diffuse severe brain damage with bilateral corticospinal tract signs, coma vigilante, below elbow amputation—left forearm, chronic urinary tract infection, severe dermatitis of the buttocks and a fractured left clavicle.

She did not benefit from the therapy at All Saints' Hospital because of her semi-conscious condition, and on August 12, she was transferred to Manchester House, a nursing home which specializes in the care of patients with brain damage. She gradually regained consciousness and some control over physical movements. On May 31, 1967, she was released to her parents who were instructed to continue rehabilitation at home. This was not successful and on April 1, 1968, she was admitted to the Pennsylvania Rehabilitation Center, Bureau of Vocational Rehabilitation, Johnston, Pennsylvania. She was discharged on May 3, because of her emotional outbursts. From the time of the accident and for many months thereafter, she had a catheter into her bladder.

At the present time, aside from her obvious physical injuries, her principal disabilities stem from the brain damage which affects her mentally, emotionally and her motor control. She is obsessed with food; her weight has increased from 130 pounds to 180 pounds; she has tremendous strength but cannot stand without help and support; she walks with a broad ataxic gait; her behavior is erratic; she frequently laughs or cries for no apparent reason and has problems described as emotional lability; her mental capacity is superficial and simple; her memory is inferior to 98 percent of the population; she is mentally about 5.13 years of age, with perseveration and obsessive compulsive behavior; she is psychotic; men in general are targets of her emotional outbursts and stubbornness. Psychological tests show that she is so greatly disturbed that a complete examination could not be made. There is no hope of recovery or improvement.

The hospital and medical bills to the time of trial totaled $17,325.69. These expenses were fair, reasonable and necessary for the treatment of her injuries. Under Pennsylvania law, her father is entitled to recover for the expenses incurred before she reached the age of 21. Discovich v. Chestnut Ridge Transp. Co., 1952, 369 Pa. 228, 85 A.2d 122. It has been held that if the mother of an injured minor is contributorily negligent, an action by the father for any losses which he sustained by reason of injuries to the minor is barred. Riesberg v. Pittsburgh & Lake Erie R. R., 1962, 407 Pa. 434, 180 A.2d 575. However, the recent case of Smalich v. Westfall, 1970, 440 Pa. 409, 269 A.2d 476, seemingly has altered the rule of Riesberg:

> " * * * [A] plaintiff ought not to be barred from recovery against a negligent defendant by the contributory negligence of a third person unless the relationship between the plaintiff and the third person is such that the plaintiff would be vicariously liable as a defendant for the negligent acts of the third person * * *.

> " * * * *

"In essence, we now recognize that, contrary to what we have said in many prior automobile accident cases, only one of the three relationships discussed above, that of master-servant, gives rise to vicarious liability for negligence. Perhaps many of the harsh results sometimes associated with the imputation of contributory negligence can be attributed to our mistaken assumption that a principal is vicariously liable for the negligent acts of his agent. We therefore now state unequivocally that only a master-servant relationship or a finding of a joint enterprise will justify an imputation of contributory negligence." (Footnotes omitted.)

There is no rule of law in Pennsylvania which would make Herbert Heym vicariously liable for the negligent acts of his wife, Mary, under the facts of this case. He should not be precluded from recovering for expenses incident to the injuries to Marilyn. This result finds support in Restatement 2d, Torts § 494 A:

"The negligence of one parent does not bar recovery by the other parent for loss of the services of their child or for medical expenses incurred in caring for him."

Comment a under this section states that the negligence of one parent is not imputed to the other to bar recovery for loss of services of their child. The sum of $15,911.69 will be awarded to Herbert Heym for this item. The balance of $1,414.00 in medical expenses were incurred after Marilyn reached 21 and will be awarded to her guardian.

A brief background of Marilyn is necessary to a discussion of other items of damage. Marilyn has a brother, Herbert H., a medical student, who lives away from home, and a brother, Robert, a mechanical engineer, who lives with his parents and Marilyn. Mr. Heym is a self-employed commercial artist. At the time of the accident, Marilyn, born November 6, 1946, was 19 years of age, had completed two years of a four year course in commercial art at the Academy of Fine Arts in Philadelphia and intended and was expected to continue to graduation, after which she intended to enter upon a career as a commercial artist. She did generally well in school, and excelled in art. Before the accident she was normal, accident free and in good health, and enjoyed the usual activities of persons in her social and economic situation, including membership in the Girl Scouts, 4-H activities and the like. She was an accomplished and a well-known rider of horses, and an instructress in all phases of horsemanship. She was slender, five feet nine inches tall, and weighted one hundred and thirty pounds.

■ Plaintiff claims past loss of earning capacity from shortly after the time Marilyn would have completed school, or July 1, 1968, to the time of the award. She would have been 21 years of age in July of 1968. The evidence showed that she would have completed school and embarked on a career as a commercial artist. Her progress in school, her family background and her paintings indicated that she was making excellent progress. The evidence convincingly demonstrated that she would have earned an average of $5,000.00 a year commencing July 1, 1968. The sum of $12,500.00 will be awarded for past loss of earning capacity.

■■ On the claim for future loss of earning capacity the question is to what extent has the economic horizon of Marilyn been shortened because of the injuries. Bochar v. J. B. Martin Motors, Inc., 1953, 374 Pa. 240, 97 A.2d 813. She is now 24 years of age. At the time of trial she had a life expectancy, according to the tables, of 54.7 years. In addition to training, background, health and habits prior to the accident, consideration must be given to other factors such as the likelihood of marriage and motherhood and the effect on earning capacity. In Vincent v. Philadelphia,

1944, 348 Pa. 290, 35 A.2d 65, 66, the court said:

"It cannot be said that plaintiffs failed to present all the evidence reasonably available in such a case to prove the probable pecuniary loss sustained. They gave a general picture of the family, the type of home they occupied, the age and employment of the father, the height, weight and general state of health of the child during the six years of her life; they showed that the father owned the house they lived in, and they would have shown also his wages had this not been prevented by defendant's own objection. But both verdicts of the jury were unintelligent and far in excess of what was justified by the application of proper legal principles. The trouble may have been due in some part to the failure of the learned trial judge—although his charge generally in regard to the measure of damages was correct—to point out certain factors entering into the estimation of the damages in this case,— for example, the lower rate of wages ordinarily obtainable in the industrial world by women as compared with men, and the likelihood of marriage and motherhood with their resulting effect on the girl's opportunity and capacity to continue through life as a wage earner. * * * "

While Vincent involved the death of a minor female, the principles are applicable to this case.[5] The likelihood of marriage and motherhood are more significant than in Vincent for there the girl was only six years of age. Marilyn's life of 19½ years, prior to her devastating injuries, presents a clear picture of prospects for marriage. She was attractive, healthy, talented, well-adjusted, and intelligent. From the age of six she was interested in horses and became a proficient rider, winning many awards. She attended and participated in many horse shows. These and school and oth-

er activities brought her in contact with the opposite sex. She enjoyed male companionship. She enjoyed teaching others to ride and engaged in hunts with others 15 years of age and above. There was a likelihood of marriage and motherhood in her future. Marriage probably would have interrupted her career, but with her training she could have resumed her career, if it had become necessary or desirable during or after marriage. Her earning capacity, as interrupted, to age 65 is $125,000.00 which when reduced to present worth at 6% simple interest under the Pennsylvania rule[6] is $62,000.00, which will be awarded for this item.

■ Other items of damage are physical and mental pain and suffering, loss of enjoyment of life's pleasures, inconvenience, disfigurement, and permanent injuries. The Government argues that a large part of Marilyn's pain and suffering was not conscious because she was in a coma or semi-coma. Even while in a coma she responded to painful stimuli. For many weeks when she was in a semi-coma she recognized members of her family but could not communicate with them. During this time she undoubtedly appreciated pain. In the future she will experience pain from her arm, the use of the prosthesis and from the therapy that she must undergo for the rest of her life. She frequently falls "with a thud," making no attempt to break her fall. She is suffering and will continue to suffer mentally. She knows that she is a girl and attempts to appear attractive. Her hostility toward men stems from an awareness that she is a girl but that she will never enjoy a normal relationship with men. She realizes that her sudden and uncontrollable outbursts are wrong and she feels badly that she cannot explain her actions and apologizes for them. In addition, she has lost the ability to engage in those activities which normally contribute to the enjoyment of life. The possibility

---

5. See also Laub, Penna. Trial Guide § 339.54 (4).

6. Brodie v. Philadelphia Transp. Co., 1964, 415 Pa. 296, 203 A.2d 657.

of marriage and motherhood are gone. Carminati v. Philadelphia Transp. Co., 1962, 405 Pa. 500, 506, 176 A.2d 440. She cannot continue in the art career that she so enjoyed, or engage in horseback riding. She has lost peace of mind and well-being. DiChiacchio v. Rockcraft Stone Prod. Co., 1967, 424 Pa. 77, 225 A.2d 913. She will never be able to dance, or engage in recreational or normal family activities. Downie v. United States Lines Co., 3 Cir. 1966, 359 F.2d 344. In short, she has lost almost every enjoyment that life can offer. An award of $650,000.00 will be made for these items. Cf. Schwartz v. United States, E.D.Pa.1964, 230 F.Supp. 536; Christopher v. United States, E.D.Pa. 1965, 237 F.Supp. 787; Tinnerholm v. Parke Davis & Co., S.D.N.Y.1968, 285 F.Supp. 432.

A final item of damage is what plaintiff has characterized as future hospitalization and related medical and incidental expense. Plaintiff contends that: Marilyn is reasonably expected to live out her life expectancy of 54.7 years; she will need constant care for life, both physical and psychiatric; this care cannot be provided at home; only one private institution, Fairmount Farm, near Marilyn's residence, is prepared to accept her and to render this care; and at the present rate of $75.00 a day and taking into account projected increases, an award of at least $8,046,379.00 should be made for this item. A much larger amount is requested if any part is taxable.[7]

■ The question of permanent, private institutional care was discussed in DiPietro v. Great Atlantic & Pacific Tea Co., 1934, 315 Pa. 209, 173 A. 165:

"* * * Assuming, *but not deciding,* that plaintiff could, if his statement of claim justified it and notwithstanding the meager evidence on the subject, recover the expense of private institutional care, he certainly was not entitled to recover therefor for the 2½ years which had expired between the date of the accident and the time of the trial, during none of which had he had private institutional care, but, on the contrary, was claiming for and proved the public institutional care and all other expenses he had incurred during that period. The trial judge said nothing on this subject. Nor could plaintiff recover as upon his life expectancy when he was in good health, for that was not the life expectancy during which he might need 'private institutional care,' especially as the basis of his claim was that, by reason of the accident, his good health was forever gone. To recover at all upon this theory he would have had to prove what was his life expectancy after his injury, and, with some reasonable measure of accuracy, the amount he would probably have to pay at the time of such periodical payments, because of his then present condition, not what was generally paid by other patients in such institutions, unless their condition was substantially the same as his." (Emphasis supplied.)

Thus, the court did not decide whether the expense of private institutional care was recoverable, and no other Pennsylvania authority has been found.[8] The

---

7. Plaintiff states in his brief: "These figures are subject to the qualification that medical costs are not taxable but income to cover nonmedical costs are taxable as income. How much of the room and board or other items may ultimately hold to be taxable cannot be predicted. One thing is certain in this area of uncertainty: if any part of the needed amount is taxable, the already huge figure will have to be increased substantially to satisfy the requirement of an adequate award for these expenses. It is not unreasonable to urge a figure of $10,000,000.00 for this item alone."

8. In Christopher v. United States, E.D. Pa.1965, 237 F.Supp. 787, cited by plaintiff, the law of Maryland was applicable, and the question involved collateral source payments from the Veterans Administration for aid and attendance at home.

several private institutions to which Marilyn was admitted were not willing to keep her for an extended period of time either because she could not benefit from their therapy programs due to her physical condition, or she had received all the benefit she could from a particular program, or she was unmanageable. Private institutions will not accept her because of the constant care she requires, and public institutions, even if they would accept her, cannot provide the necessary care. Dr. Wilson, president and medical director of Fairmount Farm, a hospital for the care of those who have mental and nervous diseases, testified that Fairmount Farm would accept Marilyn. Although he had not made extensive studies and tests of Marilyn, he indicated in a general way how he would approach her care, and testified that the hospital had the facilities and personnel to render this care. While Marilyn is presently being maintained at home, there is no doubt that her parents will not be able to cope with her much longer, much less give her the physical and emotional therapy she needs. Fairmount Farm has 130 employees, including 40 nurses, nurses aides and attendants, servicing 114 patients. In addition, there are 50 doctors on the staff. If Marilyn were admitted to this hospital, she would have the individual attention and help she needs in her everyday activities such as washing, dressing, bathing and the like. While there is no hope for improvement in her mentality, emotional improvement is possible. This will require close individual attention. Public and most private institutions are not equipped to give this atten-

tion. Her program in these institutions would consist largely of sedation in an effort to control her outbursts. The medical testimony clearly shows that heavy sedation is not the proper course of treatment of Marilyn. There is no evidence that the regime in a public institution would be adequate or comparable to that of Fairmount Farm. There is no evidence of the costs of other private institutions, or of the comparative costs of private and public institutions. Plaintiff's claim for private institutional care is a proper item of damage.

The Government suggests that the traditional lump-sum award should not be made because of the uncertainties in forecasting the cost of long-term institutional care, and the large amount of money necessary to pay for this care; it suggests that the court order the Government to establish a $500,000.00 trust fund under the control of a fiduciary which would pay all the institutional costs, and that the court retain jurisdiction to resolve any questions of administration of the trust and order the Government to replenish the corpus if the occasion should arise. Upon Marilyn's death, the balance in the fund would revert to the United States.

The common law provides for a single lump-sum judgment. McCormick, Handbook on the Law of Damages, § 13 (1935). There can be no judgment for an indefinite amount, or a judgment payable in installments. United States v. Bauman, D.Or.1943, 56 F.Supp. 109, 117; 49 C.J.S. Judgments § 76. The single lump-sum judgment as it relates to future damages has been criticized.[9]

9. Schreiber, Damages in Personal Injury and Wrongful Death Cases (Practising Law Institute, 1965) at page 21:

"There are two important practical consequences of the single recovery rule. For one thing it means that all damages, future as well as past, must be taken account of at the time of trial. This in turn faces the tribunal with the difficult and uncertain task of prophecy, with no chance for second-guessing where the prophesy turns out to be mis-

taken or where the parties have failed to present all items of their claims.

"Another important aspect of a single recovery is the burden it casts on the successful plaintiff of wise investment and of providence, wherever the recovery must be relied on to take care of future needs.

"	*	*	*

"These features mean that the single recovery rule is often both capricious and inflexible in its operation so that

On the other hand, if the single recovery rule were discarded, final disposition of cases could be delayed for years, and the courts would have to assume the added burden of supervision of their awards. In ordinary cases involving private parties there are practical considerations of insurance policy limits and the ability of defendants to pay. Frequently, cases are settled or disposed of for less than they are worth because of these. In Federal Tort Claims Act actions the ability of the Government to pay is never in question. An amendment to the Federal Tort Claims Act to provide for periodic payments when future, long range damages are significant seems desirable. If such an amendment were passed, the Government would pay more in some cases and less in others, than it would under a single recovery. In all cases justice through just compensation, no more—no less, would be achieved. Such drastic changes must come from the Congress, however, and not from the courts. The Government's suggestion is rejected.

▮ What is the life expectancy of Marilyn after her injury? Plaintiff introduced medical testimony that Marilyn's essential organs are not impaired and that she could live out her normal life span in her injured state. This testimony did not take into account other pertinent factors. Plaintiff's medical witnesses had not studied mortality statistics on brain-injured persons. A Government witness, Dr. Walker, a neurosurgeon who had conducted studies on the life expectancies on brain-injured in-

dividuals, testified that Marilyn's head injuries would reduce her life expectancy between 6 to 10 years. He said there were other factors which would further affect her life expectancy, particularly that she had a catheter in place for a long period of time which "leads to an infection of the bladder and this may involve the kidneys, so that this may flare up at any time and certainly is much more likely to cause a nephritis than a person who does not have the infection." Dr. Onifer, who treated Marilyn during her stay at All Saints' Hospital, recognized this possibility.[10] Dr. Walker also testified that: as a person with brain damage gets on in years, the cerebral circulation decreases and more serious brain involvement and death result; this can also lead more readily to circulatory troubles of other kinds, and adversely affect vital organs such as the heart and kidneys; brain damaged persons can die from a convulsion or seizure through suffocation, or from falling during the seizure; this can happen even though the person is on anti-convulsive drugs; obesity in brain damaged persons cannot be controlled and results in a shortening of the life span;[11] and Marilyn's violent outbursts toward others might reduce her life expectancy because of violent retaliation, or injuries suffered in an attempt to restrain her.[12] There is other evidence which indicates that Marilyn will encounter dangers to which the average person is not exposed, which probably will affect her life expectancy. Her physical condition aside from convulsive seizures, causes her to fall frequently.[13] Dr. Erdman, one of plain-

damages in accident cases, even where they are awarded and actually paid, often fail to do the job they should if accident law is to perform its function of administering accident losses efficiently in the public interest."

10. "BY MR. LESSIN:
 Q Dr. Onifer, as to Marilyn Heym was there anything in your examination of Marilyn that in your opinion would shorten her normal life.
 A At the time I examined her, no, except for a temporary urinary tract infection which may or may not be cleared

and, as I state, I do not know of when she left the hospital."

11. The testimony of Dr. Haft, a plaintiff's physician, supported many of Dr. Walker's observations.

12. She did attack a patient while she was at one hospital, and was abusive to other patients at other hospitals. She has attacked her brother on several occasions.

13. Mrs. Heym testified:
 "Q Does she have a tendency to fall?

**1342**

tiff's physicians, testified that her physical condition would not result in a shortening of her life expectancy if she is given adequate protection.[14] There are many factors which could shorten her life expectancy. Marilyn's life expectancy is 30 years.[15]

■ Dr. Wilson testified that the cost to maintain Marilyn at Fairmount Farm would be $75.00 a day. The Government argues that Dr. Wilson's opinion is entitled to little or no weight because his brief examination[16] of Marilyn was not for the purpose of admitting her to Fairmount Farm, but was for the sole purpose of testifying to a measure of damage. It is clear that his examination was for the purpose of admission. The Government did not introduce evidence of institutional costs but was content to rely on cross-examination. Dr. Wilson's testimony provides an adequate basis on which to make an award for private institutional care.

■ Dr. Wilson testified his $75.-00 [17] a day estimate consisted of room, board and general nursing care—$48.00; psychiatric care—$10.00; private attendant—$12.00; drugs—$2.00; miscellaneous expense—$3.00. He called the room, board and nursing care a per diem charge that would be found in most hospitals. The Government argues that courts in other jurisdictions deny recov-

A Yes. That is what our big problem is when I have to take her to the bathroom.

\* \* \* \* \*

I try to walk her.

\* \* \* \* \*

I try to walk her in order to move her and she has fallen for me many times.

\* \* \* \* \*

Q And what do you do with Marilyn during the day?

A Well, I—I have to do everything for her. The only thing she is able to do is feed herself.

Q If she attempts any walking,—

A Oh—

Q —where are you?

A I have to be in back of her, because she loses her balance very easily and I have to always be on my guard so she wouldn't. She falls over with a thud. She doesn't try to break her fall.

\* \* \* \* \*

Q Before the accident did your son Bob live in the house with you?

A Before the accident?

Q Yes.

A He was in college.

Q And how long after this accident was it before he moved back in the home?

A Last year.

Q This?

A '68.

Q Does he help with the housework around the home?

A Oh, he helps me with anything heavy around the house.

Q Does he help you with Marilyn?

A Well, now you asked a very touchy question. She has fallen for me and I would call him because he is in the house to come and help me and she does not accept it. I mean, we have a terrible scene. She gets violent.

Q And so you—

A I try to do it myself even though he is in the house.

\* \* \* \* \*

Q And when you get—after you have left her for a day or half a day, when you get home do you find the home in good shape?

A Well, she doesn't do anything to the home if she is there by herself. She leaves it—she leaves it alone. She feels a little responsibility there.

Q Do you leave anything for her to occupy her time?

A Well, I am careful that I don't leave anything around that I think would be dangerous. I don't leave anything that I think she might pick it up or—"

14. "Q Is there any other physical condition as of the time that you examined her on March 20th, 1969, that, in your opinion—that, in your opinion, as a physician, as a rehabilitation expert, as someone that deals constantly with brain damages individuals, that would shorten this girl's life expectancy?

A Not if she is given adequate protection."

15. This life expectancy was used in awarding damages for those items to which life span after injury is applicable, such as pain and suffering and future hospitalization and medical expense.

16. He saw Marilyn for one hour to one hour and a half.

17. Dr. Erdman testified that $75.00 a day is in line with the charges for the private institutional care which Marilyn needs.

ery for the subsistence portion of room and board unless it is shown to exceed the amount which ordinarily would have been expended for subsistence in the absence of the injury, citing Mintz v. Atlantic Coast Line R. Co., 1951, 233 N.C. 607, 65 S.E.2d 120. In Mintz plaintiff was allowed to testify that since her injury, she was supported by her father and her brothers and sisters. The Supreme Court of North Carolina in awarding a new trial held that this testimony was incompetent on the issue of damages. The court cited authorities for the proposition that a person is obligated to pay for his own board and keep, and that the obligation is not removed by the negligence of another; and that if the injury renders him unable to earn his board and keep, he recovers compensation for loss of time which is the equivalent of wages and he is made whole. The court went on to state, however, that a tort-feasor is liable for any expenses which are in excess of plaintiff's personal livelihood or normal support, such as expenses for "hospital treatment, convalescent care, or recuperative attention." In the ordinary case when a person is hospitalized for a period of time, no deduction is made for living expenses. Marilyn probably would have married and the award for loss of future earning capacity was much less than it would have been if she were to remain unmarried, and enter and remain in the labor market during her work life expectancy. Also, during marriage, including any period during which she reentered the labor market, her husband would owe her a duty of support. There is no Pennsylvania authority for the proposition advanced by the Government, and if adopted by Pennsylvania, it would not be applicable to the facts of this case. A deduction from the hospital charge for ordinary subsistence will not be made.

The Government attacks the $10.00 a day estimate for psychiatric care because the room and board charge "undoubtedly includes within it a margin of profit for the private institution which is owned by Dr. Wilson." Even if this were so, the profit would represent a return on his investment and the services rendered by the hospital; it would not include payment for his services as a doctor at the hospital. There is no evidence that the room and board costs include psychiatric care. The Government argues further that Dr. Erdman and the other physicians testified that constant psychiatric care would not benefit Marilyn. Dr. Erdman said that she would not be in constant need of psychiatric care insofar as the response to the injury of the brain itself is concerned, but added that some psychiatric care was needed.[18] The other medical testimony

18. "(Dr. Erdman) I believe that it might help her to understand some of her outbursts and to give her a little better control but would not change the chronic brain syndrome.

Q How often would she need to see the psychiatrist?

A In prolonged psychotherapy I don't think that this would be the necessary or appropriate or proper use of psychotherapy. I think it would be a question of having someone available who could counsel her periodically and obviously your question of periodically may be a couple of times a week or something like that, on that order.

Q Well, would this depend on how many outbursts she had?

A Obviously.

Q How many outbursts she had would in turn depend on how well she was getting along at the institution?

A Correct.

Q And if she was having outbursts every day the probability would be she wouldn't stay in the institution?

A I don't believe she would stay at Haverford State if she were having outbursts every day. I think that she could be handled in a private facility.

\* \* \* \* \*

Q Doctor, would you say that the type of institutionalization which you envision this girl as needing would be primarily custodial?

\* \* \* \* \*

A Well, I think I described this sort of institution which I had in mind.

was to the same effect, i. e., that psychiatric care was necessary for her emotional problems. The record is replete with instances of her frequent emotional outbursts. The Government points out that Marilyn did not have psychiatric care during the thirteen months she was at home prior to the trial. Dr. Elfman, a clinical psychologist, testified that she worked with Marilyn at Manchester House and for a short time after she was discharged. She also saw her on March 19, 26, 31 and April 4, 1969. She recommended that Marilyn be institutionalized because psychotherapy administered to Marilyn at home was not successful. She told her parents she would not treat her for that reason.[19] Dr. Chianese, a neuropsychiatrist at the Rehabilitation Center, Johnstown, also testified that psychotherapy should be in an institutional setting where through the use of "patterning techniquest," her outbursts could be controlled.

 The Government points out that at Johnstown Marilyn was seen by a psychiatrist for environmental control for only thirty minutes. This is the time Dr. Chianese spent with her on ten or twelve visits primarily to determine if she could benefit from the program at Johnstown which is a vocational rehabilitation institution and not a custodial or treatment institution. She was discharged because she could not benefit from the treatment. Dr. Chianese could not provide psychiatric care to each patient because he was the only staff psychiatrist for 160 patients who needed psychiatric care. Dr. Chianese's testimony and the great weight of the other medical testimony was that Marilyn needed institutionalization which would include psychiatric care for her emotional problems. It is clear that psychiatric care for Marilyn is necessary and that it must be provided in an institution. Marilyn will require psychiatric care at a cost of $10.00 per day.

 The Government argues that the estimate of $12.00 a day for a private attendant conflicts with the history of the case and Dr. Erdman's opinion concerning the future. It argues that Marilyn has not had any private attendant during the time she has been at home, that she has remained alone at home for long periods, and that the only attendant she would need, with the possible exception of a physical therapist, is someone to assist her in dressing and bathing which should come within the duties of the regular nursing staff. Dr.

---

THE COURT: Go ahead.

THE WITNESS: One in which she would be protected from overeating, from walking when she wasn't supervised, where she would be on a regular routine, sort of so that there would be a constant flow of impulses; where some psychiatric care would be available on an on-call basis."

19. She testified:

"Q Do you—do you think that a regular psychotherapy is indicated in this case?

A Well, since this is my business, I could not see psychotherapy, except in the institutional setting so that she could get along with the people there, but to bring her back and forth from a home, I have told the parents I won't take her.

Q Would the psychotherapy that you are talking about be mainly to control the emotional outbursts of which you were given a history?

A Yes, but they were organic in basis, so I would like her to get a little more

insight up to the amount, but with her memory, whatever we told her today tomorrow may not be there.

Q What evidence is there from the history that was given to you and your test that Marilyn was going to be able to adjust to an institutional environment?

A Well, we had better control over her in Manchester House than the family is having at home.

Q Was she—

MR. WELLS: Strike that.

BY MR. WELLS:

Q She—she, at Manchester House, was under tranquilizers a great deal of the time, wasn't she?

A I know nothing about her medication, but I do know that we were able to work with her better and it is not uncommon that people outside the family can do a better job—they are trained—than the family itself. That is why I wouldn't want her to have psychotherapy even five days a week in my office and go back home." (Emphasis supplied.)

Wilson testified that the charge for a private attendant was based on attendance by a licensed practical nurse for four hours a day, two hours in the morning and two in the evening, at $3.00 an hour, the current rate for practical nurses; that this attendance would have to come from overtime work by those coming off shifts because it would be impossible to get a private duty nurse to come in only two hours in the morning and evening; and that the nurse would bathe and dress Marilyn, take her out for fresh air, supervise certain activities in which she could participate with other patients, and generally provide the extra care which she needs. Dr. Erdman testified that assuming that Marilyn could be handled by the regular staff, she would need therapy for walking which would cost $10.00 a day in addition to room and board. While she has remained at home without professional attendants, her parents have been performing these services. They will not be able to continue. Dr. Chianese said that one nurse could not control Marilyn in her psychotic rages. In any case, she needs institutionalization for her emotional problems, and, therefore, will require someone to provide the services which have been provided in the past by her family.

The Government argues that the estimate of $2.00 a day for drugs is based on the erroneous assumption that Marilyn has been maintained at home on tranquilizers, whereas the only drugs she has used at home are anti-convulsants; that if she adjusts to institutional care, she would still need only anti-convulsants; and that if she did not adjust, then the cost could reach or exceed $2.00 a day but the use of these drugs would shorten her life span. Dr. Wilson testified that anti-convulsant drugs would cost a little less than $2.00 a day. His estimate was based on the average cost of drugs administered to a number of patients. There is adequate support for the estimate of drug costs.

Finally, the Government argues that the $3.00 miscellaneous cost is pure speculation. Dr. Wilson testified that the charge represented "two or three dollars for miscellaneous expense which would be difficult to estimate exactly what they might be right now such as materials for working and occupational therapy and other things like that." There is no evidence that this charge is not proper. It will be accepted.

The daily institutional cost to maintain Marilyn will be $75.00 a day. In addition to Dr. Erdman's testimony that this cost is in line with current charges, there is other supporting evidence. Dr. Chianese testified that institutions like Johnstown, a State hospital, are less expensive than private institutions, yet Marilyn's charges there averaged about $40.00 a day. Dr. Wilson maintains several other patients at Fairmount Farm who pay $75.00 a day. Under Pennsylvania law, the plaintiff is required to furnish only a reasonable quantity of information from which the fact finder may fairly estimate the amount of damages. Blackburn v. Aetna Freight Lines, Inc., 3 Cir. 1966, 368 F.2d 345. The charge for private institutionalization is amply supported by the evidence. It does not fall into the realm of speculation or conjecture. Ashcraft v. C. G. Hussey & Co., 1948, 359 Pa. 129, 58 A.2d 170.

Plaintiff presented evidence that institutionalization costs have been increasing, and that the cost of mental institutional care in the Philadelphia area has increased about $5\frac{1}{4}$ percent each year over the past ten years. Thus, plaintiff's original request for damages of $1,497,412.50 ($75.00 a day × 365 days = $27,375.00 per year × life expectancy of 54.7 years = $1,497,412.50) becomes $8,046,071.00 with the application of a factor for future cost increases. Inflationary considerations have most commonly been used in the justification of awards.[20] In many instances the consideration has been an

20. The cases are collected in 12 A.L.R.2d 611–647.

evaluation of an award considering present inflationary trends as compared to awards *in the past* as in Armentrout v. Virginian Ry. Co., S.D. W.Va. 1947, 72 F.Supp. 997, 1001:

"* * * It may be argued that ordinary fluctuations in the purchasing power of money may not properly be considered by a jury in awarding damages. *Perhaps not, as to the future;* but the jury have the right, and it is their duty, to be realistic. They need not close their eyes to the economic facts of life. It is possible, of course, that values may cease to be affected by inflation of the currency. Economic conditions may conceivably cause the value of the dollar again to rise to the point where it stood before the World War II. *On the other hand, there is no assurance that its value may not become less as time goes on. This possibility balances, if it does not outweigh, the contrary forecast. It would be, I think, mere speculation to adopt either theory as the foundation of an estimate of future earnings.* Yet some reasonable and logical basis for such an estimate must be found; and, in my opinion, it can be found only by an appraisal of present economic facts, of which the jury are presumed to have knowledge. No one can say now whether a verdict of $160,000 rendered today may be equivalent to one of $300,000 or to one of $80,000 rendered five years hence. We can be guided only by the conditions of the present; and under those conditions, we learn from economic statistics that $160,000 now represents a value of approximately $100,000 in 1939. * * *"

(Emphasis supplied.)

And in McWeeney v. New York, N.H. & H. R.R. Co., 2 Cir. 1960, 282 F.2d 34:

"* * * Though some courts have sanctioned instructions permitting the jury to take into account inflation between the injury and the trial, there is little or no authority in favor of charging the jury to take future inflation into account, see 2 Harper and James, The Law of Torts, § 25.11 (1956). * * *"

And cf. Zaninovich v. American Airlines, Inc., 1966, 26 A.D.2d 155, 271 N. Y.S.2d 866: "* * * amateurish speculation as to continuing inflation" should not be considered.

The projected inflationary trend is speculation. Plaintiff has used the decade of the 1960's, one of the more inflationary times in the history of our country, as the basis for a projection of over fifty years. It is common knowledge that our Government is and has been attempting to control inflation, even to the point of considering wage and price controls. Economists differ on their predictions. Moreover, plaintiff will have money that can be invested and if inflation continues, the return on the money will be greater, and this would have an offsetting effect. Increased costs for institutional care will not be considered.

■ The Government urges that an award for private institutional care must be reduced to present worth. Plaintiff relies on Yost v. West Penn Railways Co., 1939, 336 Pa. 407, 9 A.2d 368, for the proposition that present worth does not apply to future medical expenses, and that the institutionalization required for Marilyn falls into this category. Many of the costs which make up the daily rate of care and maintenance are not future medical expenses but rather are custodial in nature.[21] The Pennsylvania rule that future medical expenses are not to be reduced to present worth is based on the theory as expressed in Yost that:

"* * * Future medical attention presupposes an out-of-pocket expenditure by the plaintiff. She was entitled to have defendant presently place in

---

21. Plaintiff, in urging the court to consider the effect of taxes, so as to increase the requested award, recognizes that any income derived from an invested

award and used for institutionalization care, may be found to be in part a nonmedical or custodial cost and subject to taxation.

her hands the money necessary to meet her *future medical expenses*, as estimated by the jury based upon the testimony heard, so that she will have it ready to lay out when the service is rendered. \* \* \*"

Yost expresses a sound general rule,[22] although the kind of medical attention to be rendered does not appear from the facts. In the usual case, future medical expenses are sought to remedy a specific malady. If an accident victim will be required to undergo surgery, he should have the money to pay for the service if it is rendered shortly after the verdict. To apply the present worth rule to future medical expenses in most instances would necessitate the resolution of many collateral, variable and imponderable factors such as whether the victim intended to have medical attention immediately or whether his health would permit immediate treatment and if not, when it would permit it. Clearly, there would be no workable way in which to apply the present worth rule.

■■ Here, the expenses of institutionalization will recur periodically in the same manner as future earnings are payable periodically. If the rule of Yost were applied and the sum not reduced to present worth, plaintiff would have the money to "lay out" *far before* "the service is rendered." Moreover, the return on any non-reduced sum, properly invested, would exceed the cost of the institutional care. Thus, Marilyn would not only be compensated for her institutionalization, but would reap a windfall. Damages means compensation for a legal injury sustained. Sechrist v. Bowman, 1932, 307 Pa. 301, 161 A. 332. The purpose of damages is not to make people wealthy. "As to assessment of damages: it is a rational, and a legal principle that the compensation should be equivalent to the injury." Bussy v. Donaldson, 1800, 4 U.S. 206 (4 Dall. 206), 1 L.Ed. 802. The general rule of Yost, as in the case with many general rules, must yield to exceptional circumstances. The award for institutional-

---

22. The general rule in Yost has been criticized. Schreiber, Damages in Personal Injury and Wrongful Death Cases (Practising Law Institute, 1965) at pages 475–476:

"And the supreme court of Pennsylvania has stated, without giving any reason, that an award for future medical expenses need not be reduced to present value. [Citing Yost in note 12.]

"Such holdings seem to ignore the basic premise and purpose of reduction to present worth. The reasoning where given is not convincing. The damages recoverable for a tort are such as will fairly compensate the plaintiff for the wrong done. Although an award for pain and suffering is not subject to computation by any precise mathematical formula, yet it is in the nature of compensatory, not exemplary, damages. And compensatory damages are defined to be such damages as measure the actual loss, and are allowed as amends therefor.

"In an Ohio case the purpose to be served by an award of money for pain and suffering is stated as follows:

' \* \* \* An award of money damages can in no sense make the plaintiff whole, nor undo the suffering which has been undergone. Money can in no

sense be considered an equivalent for pain and suffering.

'The theory of money compensation for pain and suffering and physical injury must therefore be founded upon the fact that a money judgment operates to afford the plaintiff feelings of satisfaction, pleasure or gratification which, in the eyes of the law, will operate to offset the pain which has been undergone. In other words, the possession, control, ownership and purchasing power of money is deemed to afford the plaintiff the power of gratifying other desires and of pursuing happiness, and of resulting in feelings of contentment or of an otherwise pleasurable nature.'

"From the foregoing it would appear more reasonable to require an award for future physical and mental pain and suffering, as well as for all other future compensatory damage and losses, to be reduced to present value. Otherwise, the defendant is unduly and improperly penalized by being required to pay a sum worth more than the amount computed by the jury as necessary to fully compensate the plaintiff as the future loss occurs, and the plaintiff in effect is being overpaid." (Footnotes omitted.)

ization will be reduced to present worth. The amount so computed is $461,084.00 ($75.00 a day x 365 days = $27,375.00 per year x 30 years = $821,250.00 reduced to present worth = $461,084.00).

■ Finally, plaintiff argues that the court should add to the verdict an amount to cover income taxes on income derived from investment of the amount awarded for institutionalization because of the possibility that some of the income expended for care may be considered a non-medical cost and hence not deductible.[23] In the usual case, it is the defendant who urges that income taxes be taken into account to reduce an award of future loss of earning capacity. The great weight of authority has refused to consider income taxes in fixing damages in personal injury and death cases. 63 A.L.R.2d 1393. Pennsylvania adheres to this rule. Girard Trust Corn Exchange Bank v. Philadelphia Transp. Co., 1963, 410 Pa. 530, 190 A.2d 293. Tarter v. Souderton Motor Co., Inc., E.D.Pa. 1966, 257 F.Supp. 598. The quagmire into which the courts would sink in taking into account the effect of income taxes is illustrated in McWeeney v. New York, N.H. & H. R.R. Co., supra, in which the court pointed out that a fact finder would have to hear evidence on the possibility of marriage and children as it affects exemptions, and evidence on various categories of deductions, and the treatment of other income:

" * * * [T]he court would necessarily encounter another problem. Even the best designed instruction that stopped at that point would be unfair to the plaintiff. This is because, as proponents of the instruction recognize, the product of plaintiff's lost earning power ex-tax and his expectancy will have been discounted to produce 'that sum of money which if invested at a fair rate of return will yield annually the amount by which the plaintiff's earning capacity has been lessened and which will at time of end of the plaintiff's life expectancy be reduced to zero. This takes into account the fact that money earns interest each year; and it should be remembered that *this interest is taxable*. Therefore, if a court is going to use income after taxes as a measure of plaintiff's loss, it must add back the taxes which would be due on the interest earned— else the award would not fully compensate for the loss.'

All this is simple enough to state but how is the jury to apply it? If we suppose that plaintiff would purchase an annuity with the lump-sum previously determined, it will hardly help the jury to be told, in the language of § 72(b) of the Internal Revenue Code, that 'Gross income does not include that part of any amount received as an annuity under an annuity, endowment, or life insurance contract which bears the same ratio to such amount as the investment in the contract (as of the annuity starting date) bears to the expected return under the contract (as of such date).' Of course the court could itself calculate the exclusion ratio and charge what proportion of the annual payments would be taxable, thus leaving to the jury only the task of determining the amount of each annual payment that would be taxable, the tax thereon, and the discounted amount of the sum of such tax payments, and adding this to the ex-tax award. But here a new complication seems to arise. For a portion of the periodic payments on this sum, which is to be added to fund plaintiff's tax liability, would itself be subject to tax."

The court would also have to hear evidence on whether plaintiff intended to invest in tax-free securities, and, as pointed out in McWeeney, attorney's fees would have to be considered, not

---

23. Plaintiff's expert testified that the principal amount awarded for institutionalization would be tax exempt, but some of the income expenditures may be considered non-medical, and not deductible.

from the standpoint of damages, but of taxes. Under our present complicated tax laws, the possibilities that a fact finder would have to consider defy imagination. A trial of a negligence action would for the most part turn into a tax case, and a highly speculative one at that.

These same considerations apply to the award for institutionalization. Future taxes cannot be predicted with sufficient certitude to permit their consideration, especially in this case. Moreover, plaintiff has not submitted evidence of or suggested which costs are non-medical. The effect of taxes will not be considered.

To summarize, the damages to be awarded for the injuries suffered by Marilyn are $1,202,909.69:

To Alvin H. Frankel, Guardian of Marilyn Heym, an incompetent:

| | |
|---|---:|
| Past medical and related expenses | $ 1,414.00 |
| Loss of earning capacity, past and future | 74,500.00 |
| Pain, suffering, inconvenience, disfigurement and loss of life's pleasures | 650,000.00 |
| Future institutionalization expense | 461,084.00 |
| | $1,186,998.00 |

To Herbert Heym, her father:

| | |
|---|---:|
| Medical and other expenses incurred during Marilyn's minority | $ 15,911.69 |

A final point requires mention. At the trial, the Government moved to amend "its prior counterclaim," in No. 68–876 to assert a claim for contribution against Mary Heym. In fact, it had not filed a counterclaim in No. 68–876, but merely filed an answer to the third party complaint in which it denied negligence. In No. 40367 the Government could have filed a third party complaint against Mary Heym. Instead, it filed an aswer, and a counterclaim against Mary Heym for damages to the Government vehicle. Apparently realizing that any attempt to commence a third party action in No. 40367 would be met by the six months limitation of Rule 24 of the Eastern District Rules,[24] it attempted through the guise of an "amended counterclaim" to assert a claim for contribution in No. 68–876. In No. 68–876 judgment in favor of plaintiff could only be rendered against Mary Heym and not against the United States. Therefore, the question of contribution in favor of the United States could not arise. Conversely, the Government would not have to contribute to any award against Mary Heym until she proved that she paid more than one-half of any award. Smith v. Whitmore, 3 Cir. 1959, 270 F. 2d 741. In any case, even if the Government's motion is construed as an attempt to amend its third party answer to assert a counterclaim for contribution, the claim is not matured and cannot be asserted by way of counterclaim. Stahl v. Ohio River Co., 3 Cir. 1970, 424 F.2d 52. The motion will be denied.

To the extent that this opinion includes findings of fact and conclusions of law not set out under the specific findings of fact and conclusions of law, said findings and conclusions shall be supplementary to the specific findings and conclusions.

---

24. "Rule 19. Time of Motion to Join Third Party.

(a) A motion by a defendant for leave to bring in a third-party defendant under F.R.Civ.P. 14(a) shall be made within six (6) months from the date of service of the moving defendant's answer to the complaint.

(b) A motion by a plaintiff for leave to bring in a third-party defendant under F.R.Civ.P. 14(b) shall be made within six (6) months from the date of service of the moving plaintiff's answer to the counterclaim."