**Robbie BINDSCHUSZ, Appellee,**

v.

**Elizabeth PHILLIPS and C. Dale McClain, Executors of the Estate of Herman P. Phillips, M.D., Deceased and Paoli Orthopaedic Associates, Appellants.**

Superior Court of Pennsylvania.

Argued Sept. 19, 2000.
Filed March 27, 2001.

Marion H. Griffin, Philadelphia for McClain and Phillips, appellants.

Robert E. Slota, Bryn Mawr, appellee.

Before McEWEN, P.J., and CAVANAUGH, J. and CIRILLO *, President Judge Emeritus.

McEWEN, P.J.:

¶ 1 This appeal has been taken from the judgment entered on the verdict of the jury[1] in favor of appellee, Robbie Bindschusz, following the denial of the post-trial motions of appellants by the Court of Common Pleas of Delaware County. Appellants contend that they are entitled to a new trial as a result of certain evidentiary rulings made by the trial court. We disagree and, therefore, affirm the judgment entered upon the verdict.

¶ 2 The basic facts of the case are not in dispute. Appellee, Robbie Bindschusz, injured his knee when he jumped from a tow truck while at work on April 26, 1992. The following day he went to the offices of Paoli Orthopaedic Associates and was seen by Herman P. Phillips, M.D., an orthopedic surgeon. Dr. Phillips diagnosed appellee as suffering from a torn meniscus, and nine days thereafter, on May 6, 1992, performed arthroscopic surgery, an outpatient procedure, to repair the knee. The surgery was successful but following his discharge, appellee Bindschusz complained of such severe pain that the next day, May 7, 1992, Dr. Phillips ordered a venogram test to insure that the pain was not associated

---

* President Judge Emeritus Vincent A. Cirillo died on November 28, 2000, and did not participate in this decision.

1. The jury rendered a verdict in favor of appellee and against all appellants in the amount of $1,258,800.00, to which the court added delay damages in the amount of $438,002.04.

with a blood clot. The test results were negative for a clot.

¶ 3 Less than one week later, on May 11, 1992, Bindschusz went to the emergency room at Paoli Memorial Hospital with complaints of severe pain and swelling in his right calf. He was admitted under the care of Dr. Phillips and, while hospitalized over the next eleven days, participated in additional testing and consultations with such specialists as ordered by Dr. Phillips. Ultimately, Bindschusz was discharged from the hospital with a leg brace. A week later the brace was replaced with a cast. The cast was removed on June 5, 1992, and Bindschusz began physical therapy. On June 29, 1992, Bindschusz consulted with Dr. Phillips for the last time, as Dr. Phillips died shortly thereafter.

¶ 4 Approximately six months later, Bindschusz was diagnosed as suffering from a condition known as Reflex Sympathetic Dystrophy (RSD), a disturbance of the nervous system which causes pain of such severity that it cannot be explained by the degree of the initial injury. The condition usually progresses to involve the skin and muscles, and, according to expert testimony presented by appellee, can develop into a permanent, disabling condition if not promptly diagnosed and treated.

¶ 5 Appellee claimed that Dr. Phillips was guilty of malpractice because he had failed to properly diagnose appellee's condition, and that this failure to timely diagnose caused a delay in treating the disorder and had the effect of causing appellee permanent injury.[2] The defense at trial was twofold: first, that Mr. Bindschusz was not suffering from RSD, and second, that even if he had developed RSD, the

initial onset of his symptoms occurred long after the cessation of any treatment by Dr. Phillips.

¶ 6 The case was tried to a jury before the eminent Judge Kenneth A. Clouse and a verdict returned in favor of appellee in the amount of one million, two hundred fifty eight thousand, eight hundred dollars ($1,258,800.00). Following the denial of post-trial motions, judgment was entered in favor of appellee and this appeal timely filed.

¶ 7 Appellants contend that they are entitled to a new trial based on the following arguments:[3]

Whether appellants are entitled to judgment n.o.v. or a new trial where the trial court permitted appellee to establish the applicable standard of care by presenting the testimony of a physician who was not board certified as an orthopedist, a neurologist, or surgeon?

Whether appellants are entitled to a new trial because the trial court excluded a surveillance videotape?

Whether appellants are entitled to a new trial because the trial court's charge on causation improperly suggested that evidence of increased risk of harm established substantial factor causation?

Whether appellants are entitled to a new trial or a substantial remittitur where the jury returned a verdict of $1,258,800.00 in a case where the medical bills totaled $75,435.35, and there was conflicting evidence about plaintiff's injuries and his ability to work?

■ ¶ 8 Appellants first argue that the court committed reversible error when it permitted Wen Hsien Wu, M.D., a treating

---

**2.** Appellee's case was based on his claim, supported by his experts, that RSD in its early stages is treatable, but once it progresses to "stage II" it becomes a permanent disabling condition.

**3.** We have rephrased the issues presented in the brief of appellants.

physician and expert witness retained by appellee, to offer an expert opinion on the standard of care applicable to Dr. Phillips because Dr. Wu was an anesthesiologist and not an orthopedic surgeon.

¶ 9 We are mindful, as we review this argument, that the decision of the trial judge to admit expert testimony may be reversed only where there has been an error of law or an abuse of the substantial discretion vested in the trial court. *See: Tiburzio–Kelly v. Montgomery,* 452 Pa.Super. 158, 681 A.2d 757, 764 (1996).

¶ 10 The Pennsylvania Supreme Court has repeatedly held that the standard for evaluating the qualifications of an expert witness under Pennsylvania law is a liberal one:

> The test to be applied when qualifying an expert witness is whether the witness has *any* reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine. *Commonwealth v. Gonzalez,* 519 Pa. 116, 128, 546 A.2d 26, 31 (1988); *Kuisis v. Baldwin–Lima Hamilton Corp.,* 457 Pa. 321, 338, 319 A.2d 914, 924 (1974); *Moodie v. Westinghouse Electric Corp.,* 367 Pa. 493, 501, 80 A.2d 734, 738 (1951).

*Miller v. Brass Rail Tavern, Inc.,* 541 Pa. 474, 480–481, 664 A.2d 525, 528 (1995) (emphasis in original).

¶ 11 The learned Judge Kenneth A. Clouse has provided the following explanation of the rationale for his ruling which permitted the expert testimony of Dr. Wu:

> In the instant case, the negligent care at issue did not involve orthopedic surgical technique or even orthopedic surgery. The alleged negligent conduct was defendant Phillips' failure to recognize a neurologic pain disorder, Reflex Sympa-

thetic Dystrophy, in plaintiff and his consequent failure to treat it. The evidence established that RSD is a disease of the nervous system. RSD is an abnormal response of the nervous system to some kind of minor trauma. The negligence claimed and proved did not involve defendant Phillips' performance of orthopedic surgery but, rather, his failure to recognize RSD.

The uncontradicted evidence as to the qualifications of plaintiff's expert, Dr. Wu, was that he is one of the world's leading experts in RSD. The evidence showed that Dr. Wu was board certified in both anesthesiology and pain medicine. In this case, dealing with RSD, it was Dr. Wu's specialty certification in pain medicine that was most relevant, since RSD is commonly recognized as a chronic pain syndrome. Dr. Wu has specialized in pain medicine since 1981. Dr. Wu is a member of the worldwide International Association for the Study of Pain ("IASP") and is also a member of the IASP's special interest group on "sympathetically maintained pain" that deals specifically with Reflex Sympathetic Dystrophy or RSD. Membership in this special interest group is by invitation only. The work of the group includes setting the definition of RSD, outlining the human symptomatology, and defining treatment for educational purposes worldwide. This group is made up of physicians and researchers, and there are only thirty (30) members of this group worldwide. The evidence established that other physicians and practitioners worldwide rely on the work of this specialty group of which Dr. Wu is a member. The evidence established that Dr. Wu sees between sixty (60) and seventy (70) patients with RSD per year and that physicians from all over the country and all over the world send

patients to his Pain Management Center at the New Jersey Medical School.[1]

1. Dr. Wu's extensive experience with RSD contrasts starkly with the limited experience of the defense expert, Dr. Bocher, who admitted that, in his entire medical career of 28 years, he had seen only 10 cases of RSD.

The evidence showed that, with respect to the diagnosis and treatment of RSD, the medical specialties of pain management and orthopedics overlap. Indeed, there was evidence that, when it comes to RSD, there is overlap with other medical specialties as well, including neurology and anesthesiology. Dr. Wu, as a specialist in pain management, works with specialists in orthopedics.

There was additional evidence that Dr. Wu had, in the course of his medical career, personal experience as a surgeon, in which he performed surgery on patients and became familiar with post-surgical complications. There was also evidence that Dr. Wu had direct responsibility for the care of post-surgical patients, including post-orthopedic surgery patients in his tenure as director of the intensive care unit at the West Virginia University Medical School. There was evidence that he continues to do surgery in his pain management work, including, for example, the surgical implantation of spinal cord stimulators and infusion systems. Dr. Wu's surgical experience has relevance to this case because the evidence showed that Mr. Bindschusz's RSD developed, in part, as a complication of the surgery he underwent.

The evidence established that Dr. Wu personally had experience diagnosing and treating patients with RSD, as well as conducting research on RSD. There was also evidence that Dr. Wu was invited back to his home country of Taiwan to teach the medical profession there about chronic pain disorders, including RSD, and that, in part due to his efforts, pain management programs are now present in all twelve (12) medical schools in Taiwan, and RSD clinics are present in many of those schools where there were none before. There was evidence that Dr. Wu has personal experience with the technique of "differential diagnosis" (the medical decision making process of making a diagnosis) and that the technique of "differential diagnosis" is a fundamental piece of work every ... physician needs to master and is applicable to all medical specialties. This experience has relevance to this case because Dr. Wu's opinions concerning the care rendered by defendant Phillips involved allegations that Dr. Phillips was negligent in failing to make a correct differential diagnosis of Mr. Bindschusz's condition.

Since it was upon this rather ample evidentiary basis that the trial court overruled the objection to the qualifications of Dr. Wu, we find the argument of appellants that this ruling was error to be wholly meritless.

[T]he standard for qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine.

*Chanthavong v. Tran*, 452 Pa.Super. 378, 682 A.2d 334, 338 (1996) (citations omitted).

A witness may qualify as an expert if his or her experience or education logically or fundamentally embraces the matter at issue. *Dambacher by Dambacher v. Mallis*, 336 Pa.Super. 22, 485 A.2d 408, 418 (1984) (en banc), *appeal dismissed*, 508 Pa. 643, 500 A.2d 428 (1985). In the

area of medicine, specialties sometimes overlap and a practitioner may be knowledgeable in more than one field. *Estate of Pew,* 409 Pa.Super. 417, 598 A.2d 65, 69 (1991), *allocatur denied,* 530 Pa. 645, 607 A.2d 255 (1992). *See also: Lira v. Albert Einstein Med. Center, supra,* [559 A.2d at 553]. " 'Different doctors will have different qualifications, some doctors being more qualified than others to testify about certain medical practices. It is, however, for the jury to determine the weight to be given to expert testimony, in light of the qualifications shown by the expert witness.' " *Pratt v. Stein, supra,* 444 A.2d at 706 n. 52, *quoting Taylor v. Spencer Hosp.,* 222 Pa.Super. 17, 292 A.2d 449, 453 n. 2 (1972).

*Montgomery v. South Philadelphia Medical Group, Inc.,* 441 Pa.Super. 146, 656 A.2d 1385, 1388–1389 (1995), *appeal denied,* 542 Pa. 648, 666 A.2d 1057 (1995). *Accord: Poleri v. Salkind,* 453 Pa.Super. 159, 683 A.2d 649, 655 n. 2 (1996), *appeal denied,* 548 Pa. 672, 698 A.2d 595 (1997).

¶ 12 Thus, since the decision of the trial judge in the instant case to admit the expert testimony of Dr. Wu did not constitute an error of law or an abuse of discretion, the ruling provides no basis for the relief requested.

¶ 13 Appellants next argue that they are entitled to a new trial due to the refusal of the trial court to allow them to play a videotape surveillance film of the appellee which, despite timely discovery requests, was not disclosed until after the appellee's case had been presented to the jury. We find, for the reasons set forth hereinafter, that the trial court properly precluded any use of the film at trial.

¶ 14 After the presentation of Mr. Bindschusz's case in chief, the defense *for the first time* acknowledged the existence of a 23 minute long videotape, filmed on Tuesday, May 18, 1999, 6 days prior to the start of trial, and presented on the afternoon of Wednesday, May 26, 1999, on the third day of trial, which depicted Mr. Bindschusz engaged in a variety of physical activities while working at his job at a carnival. Defense counsel acknowledged that he had received interrogatories requesting disclosure of any surveillance films, and that defense counsel's negative responses thereto were never timely supplemented as required by the Rules of Civil Procedure. Defense counsel argued that the videotape should nevertheless be admitted into evidence because Mr. Bindschusz had failed to disclose a change of residence which had impeded the defense investigators from locating him, and had also failed, until early May, to advise appellants that he was employed. Defense counsel also argued that his failure to disclose should be excused since he had not determined to utilize the film until after he heard Mr. Bindschusz testifying at trial as to his difficulty attempting to walk or engage in any other everyday activity.

¶ 15 The trial court, noting that counsel had received the surveillance tape prior to the commencement of trial, and had been aware since the 1995 deposition of Mr. Bindschusz of his claims of physical disability, ruled that the videotape was inadmissible due to the failure of counsel to produce the tape at any time prior to the trial.

¶ 16 Appellants now claim that the exclusion of this evidence constitutes reversible error, entitling them to a new trial since the videotape, recorded on May 18, 1999, and received by defense counsel on May 22, 1999, two days prior to the start of trial, and four days prior to advising the court of its existence, "depicted Mr. Bindschusz climbing stairs, kneeling, bending, walking without assistance, and engaging in a variety of other activities". For the

reasons set forth hereinafter, we find that the ruling of the trial court was a proper exercise of its discretion under the circumstances of this case and thus reject this claim of error.[4]

¶ 17 Although we have been unable to locate Pennsylvania appellate authority precisely on point,[5] this issue was carefully analyzed and, we believe, properly resolved by Judge J. William Ditter, Jr., almost thirty (30) years ago in *Snead v. American Export–Isbrandtsen Lines, Inc.*, 59 F.R.D. 148 (E.D.Pa.1973), in ruling on a motion to compel answers to interrogatories designed to disclose the existence of such films.

> The main purpose for secret motion pictures of a plaintiff is to impeach his credibility. Films taken without the knowledge of the subject often have a dramatic impact in court. One who has described in elaborate detail his disabilities, their extent and duration, and the limitations they impose may be shown by the camera to be a fraud. The possibility that such pictures exist will often cause the most blatant liar to consider carefully the testimony he plans to give under oath.[1]
>
> ---
>
>    1. It is in the best interests of society that valid claims be ascertained and fabricated claims be exposed. *Forster v. Manchester*, 410 Pa. 192, 197, 189 A.2d 147 (1963).

> On the other hand, the camera may be an instrument of deception. It can be misused. Distances may be minimized or exaggerated. Lighting, focal lengths, and camera angles all make a difference. Action may be slowed down or speeded up. The editing and splicing of films may change the chronology of events. An emergency situation may be made to appear commonplace. That which has occurred once, can be described as an example of an event which recurs frequently. We are all familiar with Hollywood techniques which involve stuntmen and doubles. Thus, that which purports to be a means to reach the truth may be distorted, misleading, and false.
>
> In discussing personal injury cases, most defense lawyers contend that if a plaintiff knows surveillance films exist, he will tailor what he has to say accordingly. For tactical reasons, therefore, they would prefer to have plaintiff testify and then let the jury see the films. Defendants contend that uncertainty as to the existence of surveillance pictures is the best way to promote truthfulness and the showing of such films in court, a proper way to penalize a plaintiff who has been dishonest.
>
> Lawyers representing plaintiffs, on the other hand, argue that unless they can check the integrity of the photographer, the accuracy of his methods, and review

---

4. We are cognizant of the complicated issues which may arise at trial where defense counsel has advised plaintiff's counsel of the existence of a surveillance video which defense counsel does not intend to introduce at trial. *See: Gibson v. The National Railroad Passenger Corp.*, 170 F.R.D. 408 (E.D.Pa.1997). As this Court may not provide advisory opinions, we do not today address those issues certain to arise in future cases, such as: the right of defense counsel to obtain as of right a videotaped deposition of a plaintiff prior to answering any interrogatories concerning surveillance, *cf. Tillett v. Shento*, 131 Pitts.L.J. 297 (1983); the unavailability of an adverse infer-

ence charge where defense counsel elects not to present the videotape at trial; or the inadmissibility of testimony relating to the surveillance video where the defense does not use the videotape at trial.

5. This Court, in *Dominick v. Hanson*, 753 A.2d 824 (Pa.Super.2000) held that surveillance films constitute work product and must be disclosed in response to discovery requests. The *Dominick* court did not reach the issue of when and under what circumstances disclosure must occur.

the pictures he has taken, they are deprived of the proper means to cross-examine or seek rebuttal testimony. Thus, they maintain that the need to prevent possible abuse by defense investigators requires full disclosure as to the films in advance of trial and an opportunity for them to be seen.

\* \* \* \*

Every need to provide information must be balanced against the need to withhold it. The need to know is but the converse of the need to keep secret. The only time there will be substantial need to know about surveillance pictures will be in those instances where there would be a major discrepancy between the testimony the plaintiff will give and that which the films would seem to portray. By the same token this would be the only instance where there is a substantial need to withhold that information from plaintiff's counsel. If the discrepancy would be the result of the plaintiff's untruthfulness, the substantial need for his counsel to know of the variance can hardly justify making the information available to him. On the other hand, if the discrepancy would result from misleading photography, the necessary background information should be made available to the plaintiff's attorney so the fraud can be exposed. It goes without saying that the means to impeach should not be the exclusive property of the defense. Any rule to be formulated, therefore, must balance the conflicting interests of the plaintiff against the conflicting interests of the defendant and protect both insofar as it is possible to do so. In addition, the objectives of the discovery rules must be kept in mind so that a just and speedy determination of cases can be obtained.

I conclude these purposes can best be achieved by requiring the defense to disclose the existence of surveillance films or be barred from showing them at trial. If the defense has films and decides it wants to use them, they should be exhibited to the plaintiff and his counsel. If filed, supplementary interrogatories should be answered giving full information as to the details surrounding the taking of these pictures. **Before any of these disclosures, however, the defense must be given an opportunity to depose the plaintiff fully as to his injuries, their effects and his present disabilities.** Once his testimony is memorialized in deposition, any variation he may make at trial to conform to the surveillance films can be used to impeach his credibility, and his knowledge at deposition that the films may exist should have a salutary effect on any tendency to be expansive. At the same time, if the plaintiff believes that the films seem to give a false impression, he can then obtain the necessary data to serve as a basis for cross-examination.

*Snead v. American Export–Isbrandtsen Lines, Inc., supra,* 59 F.R.D. at 150–151 (emphasis supplied).

¶ 18 Appellants were required to supplement their answers to interrogatories after obtaining the videotape. *See: Dominick v. Hanson, supra.* Additionally, Pa.R.C.P. 212.2(a)(4) also required appellants to list the surveillance tape as a potential trial exhibit. The failure to supplement their answers to interrogatories and include the videotape as a potential trial exhibit resulted in unfair and prejudicial surprise to appellee midway through the trial, the precise evil which the discovery rules were drafted to foreclose.[6]

6. Nor may we overlook the substantive nature of the videotape evidence. The filmed de-

Therefore, the ruling of the trial court was proper and we reject the claim of error.

¶ 19 Appellants next argue that the trial court committed reversible error in its charge on causation which allegedly "combined the distinct inquiries as to increased risk of harm and substantial factor causation by suggesting that evidence of an increased risk of harm necessarily establishes substantial factor causation".

¶ 20 The portion of the charge at issue provided as follows:

When a defendant physician negligently fails to act, or negligently delays in employing diagnostic or therapeutic measures and his or her negligence is a substantial contributing factor in causing injury to the patient, the plaintiff does not have to prove to a certainty that proper care would have, as a medical fact, prevented the injuries in question. If a defendant physician's negligent conduct or inaction has effectively terminated the patient's chances of avoiding injuries he or she may not raise conjectures as to the measure of the chances that he is put beyond the possibility of realization. If there was any substantial possibility of avoiding the injuries, and the defendant has destroyed that possibility, he or she is liable to the plaintiff. A causal connection between the injuries suffered and the defendant's failure to exercise reasonable care may be proved

by evidence that the risk of incurring those injuries was increased by the defendant's negligent conduct.

¶ 21 Appellants contend that this portion of the charge [7] "was misleading because it failed to inform the jury that it must evaluate the evidence of both parties, not just plaintiff's evidence of increased risk of harm, when determining causation". Contrary to the claims of appellants, the trial judge carefully instructed the jury on the plaintiff's burden of proof, proximate causation, and proximate causation in the special context of an increased risk of harm case, specifically noting that the defendants could **not** be found liable to the plaintiff, even if negligent, if any "other cause would have produced the injury complained of independently of the [appellant's] negligence". Since the charge was a correct and clear explanation of Pennsylvania law, this claim of error was properly rejected by the trial court.

¶ 22 Appellants, in their final argument, allege that the trial court erred when it refused to grant a remittitur of the damages awarded by the jury. The venerable President Judge Emeritus William F. Cercone aptly addressed this issue as follows:

Normally, the determination of the amount of damages that a person is to be awarded for pain and suffering, both

---

piction of the severity of the impairment claimed by appellee is surely substantive as it would tend to prove or disprove the extent of the impairment, and thereby enhance or diminish the recovery which the jury might decide to award. Thus, however preoccupied carriers and their counsel may be with the impeachment purpose of surveillance film, such evidence is also in part substantive and, thereby, discoverable. *See: Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513 (5th Cir. 1993), *cert. denied*, 511 U.S. 1029, 114 S.Ct. 1536, 128 L.Ed.2d 189 (1994).

7. Counsel for appellants conceded that this portion of the charge was a verbatim recitation of SSJI 10.03(b), but incorrectly contended that no appellate court had addressed whether the charge correctly conveyed the applicable law. In fact, the argument presented by appellants was first raised by the late esteemed Judge Donald E. Wieand in his dissenting opinion in *Hoeke v. Mercy Hospital of Pittsburgh*, 299 Pa.Super. 47, 445 A.2d 140 (1982). The panel majority in *Hoeke* specifically rejected the challenge to the charge urged upon us by appellants.

past and future, is primarily a jury question. *Stoughton v. Kinzey,* 299 Pa.Super. 499, 445 A.2d 1240, 1242 (1982). Judicial reduction of a jury award for compensatory damages is appropriate only when the award is plainly excessive and exorbitant in a particular case. *Haines v. Raven Arms,* 536 Pa. 452, 455, 640 A.2d 367, 369 (1994), *supplemented by* 539 Pa. 401, 652 A.2d 1280 (1995). The trial court may grant a request for remittitur only when a verdict that is supported by the evidence suggests that the jury was guided by partiality, prejudice, mistake or corruption. *Krysmalski by Krysmalski v. Tarasovich,* 424 Pa.Super. 121, 622 A.2d 298, 312 (1993) (*en banc* ), *appeal denied,* 535 Pa. 675, 636 A.2d 634 (1993).

"A remittitur should fix the highest amount any jury could properly award, giving due weight to all the evidence offered." *Cashdollar v. Mercy Hospital of Pittsburgh,* 406 Pa.Super. 606, 595 A.2d 70, 76 (1991). Therefore, the correct question on review is whether the award of damages "falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption." *Haines v. Raven Arms, supra,* (citing *Carminati v. Philadelphia Transportation Co.,* 405 Pa. 500, 509, 176 A.2d 440, 445 (1962)). On appeal, the Superior Court is not free to substitute its judgment for that of the fact finder. *Botek v. Mine Safety Appliance Corp.,* 531 Pa. 160, 166, 611 A.2d 1174, 1176 (1992). Rather, it is our task to determine whether the post-trial motions judge committed a "clear gross" abuse of discretion when conducting its initial evaluation of a defendant's request for remittitur. *Id.* at 165, 611 A.2d at 1176.

*Doe v. Raezer,* 444 Pa.Super. 334, 664 A.2d 102, 105 (1995) (footnote omitted), *appeal denied,* 544 Pa. 630, 675 A.2d 1248 (1996). *Accord: Gunn v. Grossman,* 748 A.2d 1235, 1240–1241 (Pa.Super.2000), *appeal denied,* —— Pa. ——, 764 A.2d 1070 (2000); *Petrasovits v. Kleiner,* 719 A.2d 799, 806–807 (Pa.Super.1998).

¶ 23 Our review of the record, in light of the evidence accepted by the jury, compels the conclusion that the trial court committed neither an abuse of discretion nor an error of law when it refused the request of appellant for a remittitur. The evidence offered by appellee and accepted as credible by the jury established that appellee will suffer with RSD for the remainder of his life and will never be free of the pain associated with the disease. Appellee, who was employed full time prior to his accident, will never be able to work full time or to cease using medications for control of his pain.

¶ 24 Appellee also introduced evidence establishing that his future medical expenses will be $246,000, that his past lost wages were $168,000, and that his future lost wages over the remaining 34 years of his life expectancy should approach $576,000. Appellants offered no evidence at trial to refute these calculations which amounted, with the addition of $75,435.35 in past medical expenses, to special damages in the amount of $1,065,435.35. Thus, the evidence accepted by the jury clearly supports the damage award of $1,258,800.

¶ 25 As the arguments presented by appellants are without merit, we affirm the judgment entered on the award of the jury.

¶ 26 Judgment affirmed.

¶ 27 CAVANAUGH, J., files a concurring opinion.

CAVANAUGH, J.:

¶ 1 I join the majority opinion, but write separately to state that to the extent that

it is held that when surveillance tapes are obtained, there must always be an amendment to appropriate interrogatory answers. I disagree. As demonstrated in *Dominick,* there may be circumstances where supplemental answers are not necessary. Where, as here, it is argued that counsel did not have the tapes until the eve of trial, may be another such circumstance. However, I agree that the trial court did not err in refusing to allow usage of the surveillance tapes because 1) the tapes were recorded on May 19 and trial commenced on May 24 thus providing vigilant counsel ample time to disclose their existence before trial so that opposing counsel could be alerted to avoid any undue prejudice which might flow from usage of the tapes and, 2) the concession by appellant's trial counsel that appellee's trial testimony as to his physical limitations did not differ from his 1995 deposition testimony[8] thus negating any surprise at trial which might have lent the tapes immediate relevance.

---

8. See trial court opinion page 15.