**Lori and Greg DUNCAN, Appellants,**

v.

**MERCY CATHOLIC MEDICAL CENTER OF SOUTHEASTERN PENNSYLVANIA, a/k/a Fitzgerald Mercy Hospital, Appellee**

Superior Court of Pennsylvania.

Argued Sept. 26, 2001.
Filed Nov. 26, 2002.

John E. Savoth, Swarthmore, for appellants.

Arthur B. Keppel, Philadelphia, for appellee.

Before: HUDOCK, STEVENS, and OLSZEWSKI, JJ.

STEVENS, J.:

¶ 1 This is an appeal from the judgment entered on the jury's verdict in favor of Appellee, Mercy Catholic Medical Center ("MCMC"), following the Court of Common Pleas of Delaware County's denial of post-trial motions. Appellants, Greg and Lori Duncan, contend that an erroneous evidentiary ruling entitles them to a new trial. We agree and, therefore, reverse and remand for a new trial.

¶ 2 The trial court has aptly summarized the underlying facts and procedural history of the case as follows:

This matter arises from an incident which occurred on October 23, 1996 at defendant's hospital, Mercy Catholic Medical Center (MCMC). On that date, plaintiff, Lori Duncan, was admitted to the hospital to deliver twins. A nurse employed by the hospital attempted to start an intravenous (IV) in [Mrs. Duncan]'s right wrist. She made two unsuccessful attempts to enter a vein, stopping when [Mrs. Duncan] complained of intense pain radiating up her forearm and down into her right hand. An IV was finally established by another nurse in [Mrs. Duncan]'s left hand. Neither this series of events nor any complaints by [Mrs. Duncan] of pain were documented in the hospital records.

[The Duncans] contend[ ] that the actions of the nurse in attempting to insert the IV deviated from the standard of care for such a procedure and resulted in permanent injury to [Mrs. Duncan]'s right hand. Additionally, [Mrs. Duncan] was injured in September 1999 when a glass dish slipped out of her weakened right hand while she was washing it, resulting in a significant laceration of her left hand. [The Duncans] contend[ ] this subsequent injury further magnified [Mrs. Duncan's] already disabled status. A jury trial was held in this matter from September 18, 2000 through September 20, 2000. At trial, [Mrs. Duncan] testified to the severe functional limitations her injury imposed. She could not hold or carry things, and she could not hold baby bottles to feed her infant twins. (N.T. 9/18/2000, pp. 113–14). Indeed, she testified that when she sustained the laceration to her left hand, she alerted her neighbor by kicking the neighbor's door because she couldn't grip the door handle with her right hand. (N.T. 9/18/2000, pp. 116–17). Two doctors offered expert testimony on her behalf. A vocational rehabilitation specialist, Dr. Jasen Walker offered his opinion that [Mrs. Duncan] was totally disabled as a result of her hand injury. (N.T. 9/19/2000, p. 56).

Defendant, MCMC, vigorously contested liability. MCMC claimed that the sole cause of [Mrs. Duncan]'s injuries was preexisting carpal tunnel syndrome resulting from her job as a claims processor. MCMC also claimed that there is no objective evidence of injury or of [Mrs. Duncan]'s complaints of continuing pain. Finally, MCMC asserted that if there was injury to the radial nerve by the nurse inserting the IV, that fact alone is not conclusive of negligence and moreover, that type of injury would not result in the symptoms [Mrs. Duncan] was experiencing.

The jury returned a verdict in favor of [MCMC]. [The Duncans filed a] motion for post-trial relief...challenging as error the court's decision allowing [MCMC] to cross-examine [Mrs. Duncan] on her observations of a surveillance video....

In [MCMC]'s case-in-chief, defense counsel sought to introduce a surveillance videotape showing [Mrs. Duncan] engaged in various activities, such as opening a car door, carrying her child, etc. [MCMC] did not conduct this surveillance. Rather, the videotape was obtained by defense subpoena from [Mrs. Duncan]'s former employer, Principal Financial Group.

The first time counsel for [MCMC] revealed the existence of the videotape to counsel for [the Duncans] was at the start of [MCMC]'s case-in-chief. [The Duncans]'s counsel requested that he be permitted to view the videotape out of the presence of the jury to determine if an objection was warranted. The tape was shown in open court [outside of the jury's presence.] After viewing the videotape, counsel [for the Duncans] objected to its admission on the basis that its existence had not been disclosed during discovery. [Counsel for the Duncans] pointed out that No. 7 of "Plaintiff's Request for Production of Documents" specifically requested [discovery of, *inter alia*, videotapes related to the present action]. In response to this request, MCMC responded "none." . . . . MCMC never supplemented this response.

The court entertained argument on this issue. MCMC asserted that they were under no obligation to reveal either the tape's existence or their intent to use it because . . . the fact [that Principal Financial Group had conducted an "activities check" on Mrs. Duncan] was made known to [Mrs. Duncan]'s own doctor, . . . [thus eliminating any unfair surprise]. [T]he court [disagreed, and] found [MCMC] had a continuing obligation to disclose [the tape] pursuant to [the Duncans]'s aforementioned discovery request. (N.T. 9/19/2000, p. 103). [The Duncans]'s objection to the jury viewing the videotape was sustained. (N.T. 9/19/2000, p. 105).

Immediately after the ruling, MCMC called Mrs. Duncan to the stand as an adverse witness. She was questioned about the many activities she performed on the videotape. (N.T. 9/19/2000, p. 111–115). This was an obvious attempt to impeach her credibility on the issue of the functional limitations the alleged hand injury produced. (She acknowledged that on the videotape she was performing certain activities with her hands.) (N.T. 9/19/2000, pp. 111–115). She had previously testified on direct that she was unable to perform many of these same activities. (N.T. 9/19/2000, pp. 113–114). [Counsel for the Duncans] objected to this entire line of questioning, characterizing it as an "end run" around the exclusion of the videotape. Nonetheless, the court permitted [MCMC] to cross-examine [Mrs. Duncan] on specific activities she performed on the videotape. It is this ruling which [the Duncans] contend is an error of law or abuse of discretion which mandates a new trial.

Trial Court's Pa.R.A.P.1925 Opinion, pp. 1–5.

¶3 The Duncans present one issue in support of their appeal for a new trial: **WHETHER THE TRIAL JUDGE COMMITTED AN ERROR OF LAW OR ABUSE OF DISCRETION IN PERMITTING [MCMC] TO CROSS-EXAMINE PLAINTIFF, LORI DUNCAN, ON HER OBSERVATIONS OF A SURVEILLANCE VIDEO THAT HAD NOT BEEN DISCLOSED DURING PRE-TRIAL DISCOVERY.**

Brief of Appellants at 4.

■■■ ¶4 It is well-settled that the grant of a new trial is a matter within the discretion of the trial court. *Martin v. Evans*, 551 Pa. 496, 711 A.2d 458 (1998).

Our standard of review of an order denying a motion for a new trial is to decide whether the trial court committed an error of law that controlled the outcome of the case or committed an abuse of discretion. *Fanning v. Davne*, 795 A.2d 388 (Pa.Super.2002). An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, discretion is abused. *Id.* Nor does our determination in this regard turn on whether this Court might have reached a different conclusion, but depends instead on whether there was such lack of support for the trial court's action as to render it clearly erroneous. *Id.*

¶ 5 In *Bindschusz v. Phillips*, 771 A.2d 803 (Pa.Super.2001), a medical malpractice defendant withheld surveillance videos of plaintiff from discovery, despite requests for the disclosure of any such videos, and first revealed the videos at trial to impeach plaintiff's testimony regarding his alleged physical limitations. The trial court excluded any use of the video at trial for reasons of unfair surprise.

¶ 6 On appeal, and without Pennsylvania authority on the admissibility of surveillance evidence withheld from discovery, this Court turned to the courts of the Eastern District of Pennsylvania and their decisions regarding the Federal Rules of Civil Procedure.[1] Recognizing the competing interests of the defendant to expose fraud and of the plaintiff to test the integrity of impeachment evidence, the federal decisions require a defendant to disclose the existence of surveillance videos, but only after defendant has had the opportunity to depose a plaintiff regarding the extent and effect of plaintiff's alleged injuries. Such a procedure, the federal decisions reason, allows a defendant to expose

any discrepancy between the deposition testimony and what is depicted on the video, and provides a plaintiff with adequate time to evaluate what may in his opinion be a misleading depiction necessitating the development of rebuttal evidence.

¶ 7 This Court agreed that the purpose of Pennsylvania's own discovery rules—prevention of surprise and unfairness, and the fostering of a fair trial on the merits—was best served by the procedure espoused in the federal cases. *Bindschusz*, 771 A.2d at 811. (citing *Snead v. American Export–Isbrandtsen Lines, Inc.*, 59 F.R.D. 148 (E.D.Pa.1973)). *See also Gibson by Gibson v. Amtrak*, 170 F.R.D. 408 (E.D.Pa.1997) (failure to disclose existence of surveillance videos inconsistent with discovery rules meant to make trials "less a game of blind man's bluff and more a fair contest.") (citations omitted). Accordingly, we held that "the trial court properly precluded any use of the film at trial." *Bindschusz*, 771 A.2d at 809.

¶ 8 Here, the trial court sanctioned MCMC's discovery violation by denying MCMC the opportunity to show the surveillance video of Lori Duncan. Nevertheless, MCMC was permitted to refer directly to the surveillance video and to elicit testimony describing in detail Lori Duncan's activities as they appeared on the video:

> MCMC: Mrs. Duncan, you had an opportunity while we were on a break here to look at a video. Isn't that correct?
>
> COUNSEL: Objection, Your Honor. We're still on the end run here.
>
> THE COURT: Well, I'm going to permit that question.

---

1. We have noted that such federal cases have no precedential authority in this Court, but have found such "case law persuasive considering the similarities between the federal and state discovery rules." *Dominick v. Hanson*, 753 A.2d 824 (Pa.Super.2000).

LORI DUNCAN: Yes. I did.

MCMC: And you saw the video, and you were in that video. Correct?

LORI DUNCAN: Correct.

MCMC: Would you agree with me that in that video you were using your right hand rather freely?

COUNSEL: Objection, Your Honor.

THE COURT: Sustained.

MCMC: Would you agree with me that in that video we could see you using your right hand?

COUNSEL: Objection, Your Honor. Again, she's trying to get the video-tape in which has been excluded.

THE COURT: Well, I think—the way she phrased the question is not specific, but...

COUNSEL: Okay.

THE COURT: ...I'll permit questions that are specific with respect to...[incomplete remark].

MCMC: Did we see you in that video using your right hand?

LORI DUNCAN: Yes. I feel moderately. Yes.

MCMC: Did we see you in the video using right hand to open a door?

LORI DUNCAN: Yes. I had to open a door. I had a child in my left hand.

MCMC: Okay, and you would close the door with your right hand?

LORI DUNCAN: I had a child in my left hand.

MCMC: And you would hold the child with both hands in the video?

LORI DUNCAN: My arms.

MCMC: And you would drive a car, and end over end turning the wheel?

LORI DUNCAN: As best as I could. It was in pain, but it was as best as I could.

MCMC: And you would parallel park a mini van into tight spaces?

LORI DUNCAN: Well, most of the time, from what you've seen, it was pulling in a lot too.

MCMC: We—did we see in the video that you were parked outside of school, and you were parked with a car in front of you very close, and a car behind you very close? Did we see that in the video?

LORI DUNCAN: I pull in usually behind a car.

* * * *

MCMC: And you have to get out of that spot, don't you?

LORI DUNCAN: Yes.

MCMC: And you're able to do that. In the video, we see you doing that using both of your hands?

LORI DUNCAN: Yeah. To back up as best as I can.

MCMC: And in that video isn't it true that we see you holding various things as you bring the children home from school? It looked like a lunch pail or a lunch bag, or a school bag on your right hand—in your right hand and on your right arm.

LORI DUNCAN: My arm. Yes. The lunch pail was empty. It's just a plastic...

MCMC: But you were holding it in your right hand?

LORI DUNCAN: It was a plastic lunch pail that was empty. Yes.

MCMC: And then you opened the door—in fact, having all that stuff in your right hand you opened the door with your right hand. Isn't that correct?

LORI DUNCAN: No. My left. I believe it was in the left.

MCMC: Did we see you holding your children's hands with your right hand?

**LORI DUNCAN:** They tag on as much as they can. They don't squeeze my hand. That's . . .

**MCMC:** Now I'm going to do a characterization. Maybe it's right. Maybe it's wrong. But we see you walking like this almost constantly throughout the video. Isn't that correct?

**LORI DUNCAN:** Yes.

**MCMC:** You aren't holding your hand, or massaging your hand like you've been sitting in Court the last couple of days. Isn't that true?

**LORI DUNCAN:** I massage it as much as I can. When I'm out in public I—I don't do it crossing the street. No.

**MCMC:** I have no further questions.

N.T. 9/19/00 at 111–115.

¶ 9 We fail to see how this cross-examination prejudiced the Duncans any less than if the videotape itself had been admitted into evidence and played for the jury. Indeed, counsel for MCMC recounted the details of every scene in which there was an apparent discrepancy with Lori Duncan's earlier testimony, and even offered her own portrayal, for the jury's benefit, of how Lori Duncan carried herself in the video. Contrary to the suggestion of the trial court, therefore, the cross-examination clearly accomplished more than merely testing the testimony that Lori Duncan had offered in her case-in-chief—it implied the existence of evidence that disproved her testimony.

¶ 10 It is precisely this type of impeachment and substantive evidence that creates the greatest likelihood of unfair and prejudicial surprise,[2] and is therefore subject to the discovery procedure expressed in *Bindschusz.* Counsel for MCMC having failed to offer the contents of the tape upon the Duncans's request and after depositions, we find that specific references to, and portrayals of, the videotape were inadmissible at trial.

 ¶ 11 MCMC argues that, even if the trial court erred in permitting explicit descriptions of the video's contents, we should find the error harmless, as the jury returned a verdict of "no negligence" on the part of MCMC. "It is axiomatic that 'the . . . admission of evidence[, even if erroneous,] is not considered a ground for a new trial where no harm or prejudice has resulted.'" *Weingrad v. Philadelphia Elec. Co.,* 324 Pa.Super. 16, 471 A.2d 100 (1984) (citations omitted). The Duncans must, therefore, show not only error in the evidentiary ruling but also resulting prejudice in order to establish an abuse of discretion by the lower court. *See Collins v. Cooper,* 746 A.2d 615 (Pa.Super.2000). "When improperly admitted testimony may have affected a verdict, the only correct remedy is the grant of a new trial." *Id.* at 620 (quoting *Bucchianeri v. Equitable Gas Co.,* 341 Pa.Super. 319, 491 A.2d 835, 838–39 (1985) (citation omitted)); *See also Southard v. Temple University Hosp.,* 731 A.2d 603, 615 (Pa.Super.1999) (holding that an evidentiary ruling that is errone-

2. MCMC argues that the Duncans cannot have suffered unfair surprise because the video depicted Lori Duncan's own activities, of which she was clearly aware, and because the contents of the tape were revealed to Lori Duncan's treating physician before trial. We disagree. To give credence to the first argument would necessarily dismantle the principle of· discovery supporting *Bindschusz,* as every plaintiff captured on a covert surveillance video is engaged in conscious, voluntary activities. The unfair surprise sought to be avoided centers not on a plaintiff's actions themselves as much as on how such actions are portrayed or described by evidence withheld from discovery. As for MCMC's second argument, the trial court succinctly and correctly found that nothing in the record established that Lori Duncan's physician told Lori Duncan about the existence of the video.

ous, as well as harmful to the complaining party, may be the basis for a new trial).

¶ 12 It is true that "negligence" in a malpractice case comprises only the elements of duty and breach of such duty, while the element of injury or harm is conceptually separate from the negligence inquiry. Yet, we may not discount the strong possibility that the jury relied on the video references to find that the Duncans's entire case—including its offerings on duty and breach of duty—was a sham, unworthy of the jury's consideration. Such possible prejudice, fundamentally unfair in light of the fact that the Duncans were denied the opportunity to impeach the integrity of the video evidence, therefore may have been responsible for the verdict, and requires this Court to grant the Duncans a new trial.

¶ 13 For the foregoing reasons, we reverse the judgment entered on the case, and remand for a new trial.

¶ 14 Reversed and remanded for proceedings consistent with this decision. Jurisdiction relinquished.