J-S72040-14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| RAYMOND ALLEN MATTESON, | : | |
| | : | |
| Appellant | : | |
| | : | No. 861 WDA 2014 |

Appeal from the Judgment of Sentence Entered May 12, 2014
in the Court of Common Pleas of Fayette County
Criminal Division at No(s): CP-26-CR-0002051-2013

BEFORE: BENDER, P.J.E., SHOGAN, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.: **FILED DECEMBER 15, 2014**

Raymond Allen Matteson (Appellant) appeals from the judgment of sentence of 11 to 22 years' incarceration imposed after he was convicted by a jury of aggravated assault, simple assault, endangering the welfare of children (EWOC), and recklessly endangering another person (REAP).[1] We affirm.

The facts underlying this case, from the testimony presented at trial, can be summarized as follows. On October 4, 2013, 911 was called to the home of Lori Ann Brundege (Mother) because one of the children residing in that home, Victim, was unresponsive. Residing in the home at that time were Appellant, who was Mother's boyfriend, Appellant's brother, John

---

[1] 18 Pa.C.S. §§ 2702(a)(1), 2701(a)(1), 4304(a)(1), and 2705.

* Retired Senior Judge assigned to the Superior Court.

Reaggle (Reaggle), and Mother's three children, including Victim, who was approximately 20 months old at the time.

Paramedic Raymond Graham was the first to respond. When he arrived, he saw Appellant holding Victim "limp in his arms." N.T., 5/5/2014, at 47. Appellant told Graham that "the child had been suffering from a bad cough and had stopped breathing so he removed mucus from the mouth and … perform[ed] CPR." *Id*. at 48. Appellant also told Graham that he "put [Victim] in the shower, cold water, as he had just broke a fever." *Id*. Graham then carried Victim to the ambulance that had just arrived.

Victim was taken to Uniontown Hospital. Mother, who had been at work at a nearby diner at the time of the incident, met Victim and Appellant at the hospital.[2] Appellant told Mother that "he had changed [Victim's] dirty diaper, went into the kitchen, threw it away, washed his hands, went to get a drink and he was going to go outside with the [other children] because [they] were outside playing." *Id*. at 33. Appellant then told Mother that "something made him go in there and check on [Victim]." *Id*. When Appellant went back into the living room to check on Victim, he "was there non-responsive and his binky was hanging halfway out of his mouth." *Id*. Appellant also told Mother that "he picked [Victim] up and he shook him. He shook him like really hard to get him to respond." *Id*. at 34.

---

[2] Mother testified that initially she told hospital personnel that she was home when the incident occurred because Appellant asked her to do so and she "was scared and confused." N.T., 5/5/2014, at 36.

Victim was life-flighted to Children's Hospital of Pittsburgh due to the nature of his injuries. Victim was admitted to the Pediatric Intensive Care Center. Dr. Adelaide Eichman, a forensic pediatrician with the Child Advocacy Center, was called in to see Victim and his family on October 5, 2013.

Dr. Eichman spoke to Mother and Appellant about Victim. Mother told Dr. Eichman that, other than having the Spica cast,[3] Victim was acting "completely normal." *Id*. at 75. Victim had eaten just prior to Mother leaving for work, around 3:50 p.m. Appellant told Dr. Eichman that he was playing video games on the couch and heard Victim wake up around 6:00 p.m. He changed Victim's diaper and went into the kitchen to throw it out. Dr. Eichman testified that Appellant told her "quote, something told him to go check on [Victim], end quote." *Id*. Appellant claimed he found Victim unresponsive.

Dr. Eichman also asked Appellant about the incident that led to Victim getting the Spica cast. Appellant told Dr. Eichman that Victim "was eating cookies with [his] sisters, and that [Appellant] went into the other room to get ice cream and cake, and that when [Appellant] came out, he saw that [Victim] was going up the stairs [by himself.]" *Id*. at 76. Victim then fell down the steps when Appellant yelled at him. Appellant then picked Victim

---

[3] A Spica cast is a very large cast. In Victim's case, it covered one whole leg and went across his torso.

up, took him by the hand, and they walked into the living room. Appellant told Dr. Eichman that "he laid [Victim] down and manipulated his legs, and then heard a snap or a pop and then [Victim] started to cry." *Id*.

Dr. Eichman testified about Victim's condition and the injuries he sustained. She stated that Victim "had a large brain injury" and "multiple other injuries" and was in "grave condition" when she saw him. *Id*. at 73. She testified he had an "external ventricular drain" which had been put in by neurosurgeons to monitor pressure and take out extra fluid. Victim also had a "breathing tube in his mouth." *Id*. at 77. He also had a bruise on his ear, "which was remarkable because children really should never have bruising on their ears. It is a very unusual place to get a bruise." *Id*. at 78. Victim also had a "spinal collar on because it is pretty standard if a child comes in as a trauma, he will get a neck collar put on." *Id*.

Dr. Eichman testified about the results of the head CT scans performed at both Uniontown Hospital and Children's Hospital. Victim had "a very large right subdural" which is "basically a very large brain bleed." *Id*. at 78. Victim "also had a lot of swelling on the right side of his brain" so much so "that it pushed his brain partly onto the other side" which is called "a midline shift." *Id*. at 79. Dr. Eichman testified that the "type of the bleeding that was seen in [Victim's] head only comes from significant force." *Id*. She stated that this type of bleeding does not come from rolling off a bed or falling off a couch. Dr. Eichman also testified that Victim's "liver tests were

elevated." *Id*. A CT scan of Victim's abdomen revealed a duodenal contusion, which is a bruise on the small intestine.

Dr. Eichman testified that the "combination of subdural hemorrhage and brain swelling, in the context of a child that had a large bone injury, or his femur fracture the month before, made [her] concerned that he was the victim of physical child abuse." *Id*. at 80. Furthermore, because Victim was acting normally when Mother went to work, Dr. Eichman concluded this injury occurred after that time. Additionally, the duodenal contusion had to have been caused by punching or kicking in the stomach, "it doesn't happen by itself and it does not happen during normal play." *Id*. at 81. Dr. Eichman also testified that the story Appellant provided about the femur fracture did not make sense because a child could not walk, as Appellant reported, with a fracture of the thigh bone, the largest and strongest bone in the body. Dr. Eichman also testified that Victim was subjected to "abusive head trauma" caused by "a shaking mechanism" because it is "the only thing that can explain the amount of swelling he had on his brain[.]" *Id*. at 85-86.

Mother testified about the changes she has seen in Victim since this incident. She testified that Victim "can't walk, talk, crawl, eat by himself." *Id*. at 37. "He has no use of his left side." *Id*. "In his left eye, he has some vision but there is damage to the cable and they are not exactly sure how much he can see." *Id*. Mother also testified that prior to this incident, Victim was developing appropriately.

The jury found Appellant guilty of the aforementioned crimes. Appellant was sentenced to an aggregate term of 11 to 22 years' incarceration. Appellant timely filed a post-sentence motion, which was denied. Appellant timely appealed to this Court and timely filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925.

On appeal, Appellant sets forth three issues for our review.

> I. Whether the trial court erred in allowing Dr. [Adelaide] Eichman to testify, despite objections being made based on her qualifications.
>
> II. Whether the trial court erred in allowing a picture of [Victim] to be published to the jury, as it was highly prejudicial.
>
> III. Whether the trial court erred by preventing [Appellant] to introduce [*sic*] evidence that the only eyewitness lied to police and was on drugs at the time of this incident.

Appellant's Brief at 5 (unnecessary capitalization omitted).

As all of Appellant's issues on appeal relate generally to the admissibility of evidence, we set forth our well-settled standard of review.

> It is firmly established that questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and a reviewing court will not reverse the court's decision on such a question absent a clear abuse of discretion. Abuse of discretion is not merely an error of judgment, but judgment that is manifestly unreasonable, such as where the law is not applied or when it is the result of partiality, prejudice, bias or ill will.

***Commonwealth v. Thompson***, 93 A.3d 478, 491 (Pa. Super. 2014) (internal citations omitted).

Appellant first contends that the trial court erred in qualifying Dr. Eichman as an expert witness because "she had only testified approximately five times and she has not worked and/or practiced in the field for even one year." Appellant's Brief at 9.

Dr. Eichman testified about her education and experience in the field of forensic pediatrics. She testified that she is a board-certified pediatrician, who earned her medical degree through the University of Pittsburgh. She completed her residency at Children's Hospital of Pittsburgh. At the time of this trial, she had been working for Children's Hospital in the Child Advocacy Center for over eight months. The Child Advocacy Center "is a part of Children's Hospital where physicians and nurses work with children when there is suspected child abuse." N.T., 5/5/2014, at 67. She testified that she sees approximately 20 patients each month, and participates in peer review of an additional 50 cases each month. She has been qualified as an expert in pediatrics and child abuse "at least five times, in Fayette County and Allegheny County." *Id*. at 69. Based upon this testimony, the trial court admitted Dr. Eichman as an expert.

> [T]he standard for qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine.
>
> A witness may qualify as an expert if his or her experience or education logically or fundamentally embraces the matter at issue. In the area of medicine, specialties sometimes overlap

and a practitioner may be knowledgeable in more than one field. **Different doctors will have different qualifications, some doctors being more qualified than others to testify about certain medical practices. It is, however, for the jury to determine the weight to be given to expert testimony, in light of the qualifications shown by the expert witness.**

*Bindschusz v. Phillips*, 771 A.2d 803, 808-09 (Pa. Super. 2001) (internal quotations and citations omitted; emphasis added).

Instantly, Appellant does not challenge Dr. Eichman's qualifications as a forensic pediatrician; rather, he contends she has not been practicing long enough and has not been qualified as an expert in court often enough. As the trial court aptly pointed out based on Appellant's argument: "[H]ow would one ever qualify to testify as an expert in his or her first trial?" Trial Court Opinion, 7/22/2014, at 3. The issue Appellant raises does not impact whether Dr. Eichman was qualified to testify at trial, but rather the weight the jury could accord her testimony. If the jury felt she had not been practicing long enough as a pediatrician to reach the conclusions she reached, it could reflect that in its verdict. However, her ability to testify and offer those conclusions is not impacted. Accordingly, the trial court did not err in admitting Dr. Eichman as an expert, and Appellant is not entitled to relief on this basis.

Next, Appellant contends the trial court erred in admitting a photograph of Victim "lying on a hospital bed with several tubes running into and out of his body." Appellant's Brief at 11. Specifically, Appellant contends

that "the photograph was highly prejudicial" and served no purpose other than "to appeal to the emotions of jury members." *Id*.

> The admissibility of photographs involves a two-step analysis. First, the court must decide whether a photograph is inflammatory by its very nature. If the photograph is deemed inflammatory, the court must determine whether the essential evidentiary value of the photograph outweighs the likelihood that the photograph will improperly inflame the minds and passions of the jury.

*Commonwealth v. Baez*, 720 A.2d 711, 726 (Pa. 1998).

Here, the trial court offered the following rationale for its admission of this photograph.

> As we noted at trial, the photograph was in black and white, and there were issues as to how the injuries occurred for the fact finder to determine. Although unpleasant, the photograph depicting the condition of [Victim] was relevant to the jury's determination whether Appellant acted with specific intent to cause serious bodily injury. Although testimonial evidence described the condition, the injury was best and most accurately depicted in the admitted photograph.

Trial Court Opinion, 7/22/2014, at 6.

We ascertain no error in the trial court's determination that the at-issue photograph was admissible for the reasons stated above. In particular, we have reviewed the photograph and agree with the trial court that this black and white photograph is not inflammatory. Moreover, the Commonwealth had the burden to prove that Victim sustained serious bodily injury. 18 Pa.C.S. § 2702(a)(1); *see also Commonwealth v. McClain*, 472 A.2d 630 (Pa. Super. 1984) (holding admission of two color photographs of the victim's beaten face while in the hospital on the day after attack was

proper where Commonwealth had to show attempt to cause serious bodily injury and would better convey to the jury the injuries received than clinical comments). Thus, Appellant is not entitled to relief on this basis.

Finally, Appellant contends the trial court erred by preventing him from questioning Reaggle, Appellant's brother who resided in the house at the time of this incident, about drug paraphernalia found in his room. Appellant's Brief at 11-12. Appellant argues that had the trial court permitted this line of questioning, the "evidence could have led a jury to believe that [Reaggle] was lying, and that possibly he had some motive to lie, as he could have been the perpetrator." *Id*. at 12.

At trial, Reaggle testified on behalf of the Commonwealth that on the afternoon of October 4th he was upstairs watching the movie *Battleship*. N.T., 5/5/2014, at 8. He then went downstairs to get a drink and saw Victim "irresponsive." *Id*. at 9. Reaggle looked into the kitchen and saw that Appellant "was like shaking the baby trying to get him to come, you know, back to responsive." *Id*. Reaggle testified that he helped Appellant turn on the sink and "put water on" to see if that would "bring [Victim] back to you know revivalness (*sic*), or like responsiveness." *Id*. Reaggle also testified that he called 911 over Appellant's objections.

On cross-examination, counsel for Appellant asked the following: "Do you remember when you were being interviewed by the police making a statement to them about not using drugs and no one in the home using any

drugs?" *Id*. at 16. Reaggle answered; "Yes." *Id*. The Commonwealth objected, and a conference was held, on the record, at sidebar. Counsel for Appellant wished to pursue this line of questioning because police purportedly found drug paraphernalia in the room Reaggle was occupying. Thus, counsel for Appellant argued that Reaggle lied to police, which goes to his character. Counsel acknowledged that Reaggle was not charged in connection to this drug paraphernalia. *Id*. at 18. The trial court sustained the Commonwealth's objection.

"[T]he character of a witness for truthfulness may not be attacked or supported by cross-examination or extrinsic evidence concerning specific instances of the witness' conduct[.]" Pa.R.E. 608(b)(1). The Supreme Court has held "that a witness may not be impeached by questions concerning criminal activity not resulting in arrest." *Commonwealth v. Taylor*, 381 A.2d 418, 420 n.4 (Pa. 1977). Because permitting testimony about a specific instance of uncharged misconduct would have been improper, the trial court did not err in sustaining the Commonwealth's objection. Thus, Appellant is not entitled to relief on this issue.

Having concluded that the trial court did not err on any basis raised by Appellant, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

- 11 -

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/15/2014